UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 26-CR-20031-BB

UNITED STATES OF AMERICA,

                                        Miami, Florida
              Plaintiff(s),

                                        February 6, 2026
        vs.

T.H.,                                   SEALED

              Defendant(s).      Pages 1 – 144
-------------------------------------------------------------

DETENTION HEARING
TRANSCRIBED FROM DIGITAL AUDIO RECORDING
BEFORE THE HONORABLE EDWIN G. TORRES
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):   ALEJANDRA L. LOPEZ, ESQ.
                        UNITED STATES ATTORNEY'S OFFICE
                        99 NE 4th Street
                        Miami, FL 33132
                        305-961-9241
                        alejandra.lopez@usdoj.gov


FOR THE DEFENDANT(S):   EVAN L. KUHL, ESQ.
                        ERIC M. COHEN, ESQ.
                        OFFICE OF FEDERAL PUBLIC DEFENDER
                        150 W Flagler Street
                        Miami, FL 33130
                        305-536-6900
                        evan_lewis@fd.org
                        eric_cohen@fd.org


TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                        Court Reporter
                        jemancari@gmail.com

INDEX OF EXAMINATION

EXAMINATION OF:                                    PAGE

ANDREW DELVALLE

Direct By Ms. Lopez  . . . . . . . . . . . . . .36

Cross By Mr. Cohen . . . . . . . . . . . . . . .38

Redirect By Ms. Lopez  . . . . . . . . . . . . .61

Recross By Mr. Cohen . . . . . . . . . . . . . .78

Thereupon,

the following proceedings were held:

THE DEPUTY CLERK:  Calling case T.H., case No. 26 CR 20031, Judge Bloom.

MS. LOPEZ:  Good morning, your Honor.  Alejandra Lopez on behalf of the United States, and present for the government's side are the case agents in this matter, FBI special agent Andrew Delvalle and Emma Pitts.

MR. KUHL:  Good morning, your Honor.  Edwin Kuhl and Eric Cohen, assistant Federal Public Defenders, on behalf of T.H., a minor, who is present before the court.

THE COURT:  Good morning, everybody.

This is a sealed courtroom in connection with this proceeding under the statute Section 5034.

There is a pending motion for detention filed or that the government has asserted and that was the reason that we set the hearing for this morning.  Is that right?

MS. LOPEZ:  Yes, your Honor, that is right, and it is Section 5038.

THE COURT:  38.  Thank you.

Before we present the argument on the detention issue, I just had a couple of -- I just did a little research on what this looks like in juvenile proceedings and the nuances of juvenile proceedings that I wasn't familiar with, and there was a procedural question that I wanted to ask because it may

affect how long we are going to be here today.

One of the things -- and you correct me if I'm wrong -- one of the things that I understand is that, putting aside the merits or not of a particular detention motion, the effect of a detention order of a juvenile is that you have to then try the case in 30 days.  Am I right?

MS. LOPEZ:  If the government does not file a motion for adult transfer, which I have already told the defense I do plan on doing that, and they are going to talk to their client in order to get me their position on that motion.  The filing of the motion tolls the speedy trial period under Section 5032 and, therefore, at that point speedy trial -- the case would not have to be tried in 30 days under the JDA.  The district court must then hold a motion -- let me make it clear.

If the defense does not waive and agree to transfer to adult status, then the district court will have to hold a hearing on the adult transfer where it has to discuss those six factors that are enumerated in Section 5032.

I don't know when the district court, when Judge Bloom would do that.  I would assume, knowing her, that she would do it rather quickly.

If the court agrees to transfer to adult status, there is an interlocutory appeal that is allowed for either side, depending on the district court's decision.  So that may delay things, but speedy trial continues to be tolled during this

time.

At whatever point in which the --

THE COURT:  And the tolling comes from where specifically?

MS. LOPEZ:  From the filing of the motion, which -- give me one second.  This would be Section 5036.

If an alleged delinquent who is in detention pending trial is not brought to trial within 30 days from the date upon which such detention has begun, the information shall be dismissed.

If you look at -- one moment, your Honor.

THE COURT:  You said 5036, right?

MS. LOPEZ:  That is the speedy trial section, right.

THE COURT:  Right.

MS. LOPEZ:  That is the section that states that it must be done within 30 days if it remains within --

THE COURT:  Right.  I read that.

MS. LOPEZ:  -- a juvenile status case.

THE COURT:  Right.

MS. LOPEZ:  My understanding, based on case law that I found -- one moment.

THE COURT:  So it is not in the rule.  It is not in the statute.

MS. LOPEZ:  Not in that specific rule, that is correct.

THE COURT: OK.

MS. LOPEZ: However -- I'm sorry, your Honor. I wasn't prepared for that specific answer, but I can let the court know that I discussed this with my appellate section and they indicated to me that it --

THE COURT: There is still an appellate section there?

MS. LOPEZ: Yes.

THE COURT: That's good.

MS. LOPEZ: It is small, but it is still there.

THE COURT: OK. Good.

MS. LOPEZ: Maybe not robust.

THE COURT: OK.

MS. LOPEZ: If your Honor has other questions, I can certainly look at it. I know I have it in some of my materials here, but I just want to make sure --

THE COURT: I don't see that in the statute, and obviously the statute contemplates you, the government, moving to transfer to adult status.

MS. LOPEZ: Yes.

MR. KUHL: Your Honor, I think I can maybe shed some light on this from my understanding.

So 5036 allows the court to delay the disposition hearing in the interests of justice, and so 5032, which talks about the transfer hearing, requires the transfer of the hearing to take place only after the district court has

received all of the juvenile's records or a certification that no records are available or could be located.

So I think it contemplates that the district court could make a finding that it is in the interest of justice to delay the disposition hearing pending adjudication of the transfer motion. Because of that language the statute gives some flexibility in terms of the court's not allowed to hold a transfer hearing until it either has all of the records or a certification that no records exist.

THE COURT: What records would there be other than the docket?

MR. KUHL: Well, there wouldn't be, at least not in this case, but you can envision cases with other juveniles who have prior delinquencies.

MS. LOPEZ: Actually, your Honor, the statute does require, 5032, that the court receive a certified copy of either the juvenile's priors or a certification that no priors exist before it can be transferred to adult status. I know that is one sort of quirk. We don't expect that to exist here.

THE COURT: Right. I guess the burden to present that would be on you on your motion.

MS. LOPEZ: It is a factor. However, the, I guess responsibility to get that certification or to at least certify it to the court that it doesn't exist rests with the clerk's office under 5038 and 5032.

I think at the point in which we would discuss it in the hearing for adult transfer in 5032, I think it would be clear that such a record, at least to our knowledge, does not exist in this case, meaning I don't have any reason to believe that Mr. Hudson -- excuse me -- that T has any prior criminal adult convictions or prior adjudications of delinquency in state court.

THE COURT: OK. So therefore, how does that cut then? So there would be no reason for that delay, right?

MS. LOPEZ: No, your Honor, but I do believe that after the hearing I think part of the records that also have to be collected and prepared and presented to the court are all the exhibits and transcripts and things from the hearing of the transfer to adult status.

THE COURT: OK.

MS. LOPEZ: I will let the court know that after such a transfer is made. Meaning, if the district court were to enter an order transferring it to adult status, at that point the adult speedy trial period begins --

THE COURT: Right.

MS. LOPEZ: -- minus any time that may have run prior.

At that point, from the moment in which the order becomes final, the government then has 14 days to seek an indictment and then the case continues along the way, unless the defendant were to waive and proceed by information.

THE COURT:  Right.  OK.  The reason I bring this up is not to test you on the knowledge of the statute.  The reason I brought it up was if the government is seeking detention, my reading of the statute is that means that you have 30 days to try the case.

Are you sure that is what you want right now, number one?  That was my first broader question.  Because why would the defendant, why would the defense not want to insist on that, right, in the ordinary course.  Number one.

Number two, to the extent that that is an issue or if, for example, as a practical matter the trial this is contemplating would be post transfer to adult status, why would the detention determination not at least wait until the transfer, absent a showing that the person was of a significant risk of flight or harm, obviously, but then the presumption is no detention, is my understanding, and so therefore the burden would be much higher on you, wouldn't it, in that situation?

MS. LOPEZ:  Well, the Bail Reform Act does also lean more towards non-incarceration, although there are certain parts of the Bail Reform Act, such as subsection (f)(1), that have provisions that include presumptions, but even those presumptions are rebuttable presumptions.

I bring that only because the Juvenile Delinquency Act does state -- again, similar to the Bail Reform Act -- that there is a preference, but it does give the court the mechanism

to detain a juvenile if they believe that the juvenile is a risk of flight or a dangerousness to themselves or to the community.

Now, the JDA, unlike the Bail Reform Act, doesn't provide the standard for that, doesn't give anything beyond those words under Section 5034.  So it is, essentially, unclear, just in a plain reading of the statute, if Congress intended it to be looked at or for the standard to be the same as it is in the Bail Reform Act.

I tried to locate cases for this and, as your Honor can imagine, there is a dearth of cases on this particular issue.  My argument would be, because both the Bail Reform Act and the Juvenile Delinquency Act show a preference for non-incarceration, if the court believes that there are reasons why this person is either -- well, first, either that the government has not met their burden in whatever basis they're asking for detention or that there are less restrictive means, I would argue that it should be the same, which is that here where I'm asking for dangerousness, it should be clear and convincing evidence.

I have found no case law or statute that requires the government to prove beyond a reasonable doubt or anything higher than clear and convincing as to dangerousness.  Of course, understanding that the court may find, even if they are a danger, that there are less restrictive measures than

detention to be able to hold or to ensure that he is not a danger to himself or others.

To answer the court's first question, again, I would be seeking, and I've made this very clear to the defense that I will be seeking, to transfer this to adult status.

If this case were to be denied an adult status or if for some reason my request, when I make my motion to transfer to adult status, to have the speedy trial time period tolled during the pendency of that in the interests of justice were to be denied, I would be dismissing my information and I have an ex-colleague of mine at the State Attorney's Office who is willing to indict him in the state court as an adult, because this kind of charge would be a mandatory adult transfer or adult file in state court, what is called a direct file, and then the state court would take hold of him, in which case it would be an adult case either way.

There are reasons, both in the interests of the juvenile and in the interests of the victim's family, for why I have chosen to take this route here, but understanding that I would be requesting for the speedy trial period to be tolled.

The Federal Public Defender's Office has not been representing T since the beginning of, I guess, these events, would be the best way of saying it, and, therefore, I know that they will have to do some, given the six factors, they are going to have to do a little bit more work.  They are going to

have to talk to his prior attorney.  I'm willing to understand that, perhaps, I will need to be flexible in terms of the date that allows them to feel like they're ready to represent their client.

I say that to the court not to be difficult.  It is just that if my request for adult transfer is denied or I have the motion and the court does not toll the speedy trial period, yes, it would be 30 days.  But at that point, because I think this is an inappropriate case to remain in juvenile status, I would ask the State Attorney's Office to take it and then I would dismiss our information, which for many reasons I would prefer not to, both in the interest of the defendant and in the interest of the next of kin and the victim's family.

THE COURT:  That makes sense, but isn't the dismissal in that situation potentially with prejudice, though?

MS. LOPEZ:  Yes, it would be, and the state would take it and he would be treated as an adult over there.

THE COURT:  OK.  So what you are saying is it wouldn't be with prejudice as against state authorities --

MS. LOPEZ:  As to us.

THE COURT:  -- under their jurisdiction.

MS. LOPEZ:  That would be correct, your Honor.

THE COURT:  It would only be with prejudice to the federal proceeding.

MS. LOPEZ:  Correct.  There are many reasons why we

chose to file it here first.  The state long-arm statute does allow the state to have jurisdiction but only if the federal government relinquishes their jurisdiction first over this case, because we have primary jurisdiction because it is the special maritime jurisdiction of the United States.

There are many reasons why I have chosen to do it, both because there is a certain modicum of privacy afforded to T in this part of the proceedings, as well as the fact that the state statute regarding the sentencing of minors charged and convicted of life felonies or punishable by life felonies is, I would say, more harsh in the sentencing scheme.

Here, if it were transferred to adult status, while at some point the docket would become public at that point, there is still a modicum of privacy here.  There are no depositions that would be taking place, both from the defense side and from the government's side.  That would occur in the state proceeding.  It would afford a much more efficient resolution to this case.  Because of the state discovery laws and depositions, it would take a much longer time for the case to resolve.  But also the sentencing scheme, I believe, would be much -- I think for both the family and for T, I think it would be less harsh than the state sentencing scheme.

I discussed with Mr. Cohen on Tuesday before we came up here that should my request be denied or should it be forced to go to trial in 30 days, I would seek that remedy, because

under the JDA no matter how serious the charge, if he's tried as a juvenile, he will always get out at the age of 21. Based on the facts of this case I don't believe that is appropriate, which is why I will be asking to transfer to adult status, but that is why I would be asking the court to dismiss our information with prejudice in order to allow the state to take its long-arm jurisdiction over the case.

THE COURT: OK.

MR. KUHL: May I briefly respond to some of that?

THE COURT: Sure.

MR. KUHL: So your Honor asked whether having the hearing today kind of cuts more in our favor than it would typically under the Bail Reform Act. I think the short answer to that question is yes. The reason for that is simple.

This is a 5034 hearing where the statute says: "If the juvenile has not been discharged before his initial appearance before the magistrate judge, the magistrate judge shall release the juvenile," and then it goes on to say that this release shall happen unless the magistrate judge determines, after a hearing, at which the juvenile is represented by counsel, that the detention of such juvenile is required to secure his timely appearance before the court and to ensure his safety or that of others.

This provision of the JDA makes no reference to the Bail Reform Act. This is distinct from Section 5037, which

deals with what happens after the dispositional hearing takes place, where that actually does make an express reference to detention being governed by the Bail Reform Act.

You'll see under subsection (a) of 5037, it says at the bottom:  With respect to release or detention pending an appeal or a petition for writ of certiorari after disposition, the court shall proceed pursuant to the provisions of Chapter 207, and Chapter 207, of course, of Title 18, that is the Bail Reform Act.

I mean, I think it makes sense, right.  Obviously, Congress has made a choice that before a disposition in a juvenile delinquency case there was a strong preference in favor of release.  It is only after we have given the child some structure of due process that we actually allow the Bail Reform Act to enter into the equation.  So this is a conscious decision at this juncture for a preference in favor of release.

Counsel is right, there is a dearth of case law.  I also could not find the standard for the finding that you have to make a preponderance, clear and convincing, beyond a reasonable doubt.  It just doesn't seem to be established because these cases are so rare.

The fact that this is, number one, not a criminal offense, right, and that's exactly what the Bail Reform Act is governing if we turn to Section 3142 of the Bail Reform Act, subsection (a), which I know your Honor is familiar with.  It

says:  Upon the appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial, the person be essentially released, detained, etc.

Offense is a defined term in the Bail Reform Act and it is defined as a criminal offense.

The JDA, right, it specifically says this is not a criminal offense, and it is a clear that it can't do that because it allows the government to charge by information.  If it were a criminal offense, he would have a right to be charged by an indictment.

At this point, as we sit here today, no judicial officer or grand jury in this country has made a probable cause finding about what happened here, right.  We're here on the signature of a prosecutor.

So I think it is clear that in a 5034 hearing, which is what this is today, the Bail Reform Act plays no role and Congress, by carving out the Bail Reform Act from this hearing, has made a strong preference in favor of release.

So the last thing I would say --

THE COURT:  Do you have any reason why the followup to that is, and, again, we still have to proceed with the hearing but just so we kind of all understand what rules we are applying.

MR. KUHL:  Right.

THE COURT:  If you're correct that really the Bail Reform Act at this stage is really beside the point and you just look at the language of 5034, it clearly contemplates a finding required to ensure the safety of, either his safety or that of others.

As a practical matter, is there a functional difference?  Wouldn't any normal adjudication of that statute require some level of compelling proof --

MR. KUHL:  Right.

THE COURT:  -- which is tantamount to clear and convincing evidence?

MR. KUHL:  I think that's right.

I want the record to be clear that we're not here for a Bail Reform Act hearing.

THE COURT:  Right.  My interpretation was, well, you can detain him, but the statute, the one thing that is very different is, it mandates a 30-day period.

MR. KUHL:  Yes.

THE COURT:  And it mandates that 30-day period absent your consent, the defendant's consent, for the obvious reason that it doesn't want to have a juvenile detained more than 30 days.

MR. KUHL:  Right.

THE COURT:  So that is kind of the give and the take of doing that.

MR. KUHL:  Yes.  I mean, not to put the cart before the horse, but I think ultimately the question that the court is going to have to wrestle with today at the conclusion of the hearing is, is there a combination of conditions that we can put on his liberty to reasonably assure the court that he is not a danger to himself or others.

THE COURT:  We will move on past this point.

You raised something about the probable cause issue. Ordinarily in a detention situation I'd have to make a finding of probable cause either derivatively or independently of probable cause to sustain the charge.  Wouldn't that be normally something that -- and I have to do that as part of a detention finding.  Wouldn't that apply here?  If that was an issue, don't I have to find probable cause if I'm going to detain somebody?

MR. KUHL:  I think so.  I mean, typically it's kind of -- it's odd because in the normal course of proceedings, right, it's when you're seeing someone and the government's moving for detention, they're here on a complaint or they're here on an indictment, right.  It's rare that they come with an information without some kind of deal set up before the person comes to court.  So in those instances, yes, right, there is a probable cause finding that would be made.

Here, it hasn't been done.  So I would submit, yes, I think you're right in thinking that you would probably need to

make a probable cause finding in addition to a finding that there's no condition or combination of conditions we could put on T.H.'s liberty to ensure that he is not a danger to himself or others.

MS. LOPEZ: Your Honor, if I may. I agree that the court should do that. I'm prepared to present the evidence, and I have my case agents here, one of my case agents here to testify if the defense would like to ask cross-examination.

I have tried to tailor this as close to the Bail Reform Act as I could just because 5034 really doesn't give us a lot of guidance as to the procedure, and that is the only procedure we do have.

That having been said, I will disagree with Mr. Kuhl that somehow we are not in criminal land or somehow this is not criminal. The JDA is specifically created to provide the process by which juveniles may be charged with crimes in federal court. They could remain on juvenile status and be adjudged delinquent. That is the same language, for example, in Florida state court where someone who goes through the juvenile system having been charged with crimes is adjudged delinquent.

Now, under the federal case law -- under state case law, an adjudging of delinquent is akin to a conviction. Under federal case law we are not allowed in our adult cases to present our evidence unless for some reason the defense were to

argue he has no prior history or whatever and it would open the door.

The reason why I say this is because the JDA doesn't say you can only charge him with some things, some misdemeanors or some little rinky-dink traffic ticket that would go into the parks and postal calendar.  It specifically allows the government to bring criminal charges.

One of the things that is required and is, in fact, a part of the filing in this case, it is not only the memorandum from the Attorney General allowing the U.S. Attorney to have the statutorily-required provision under 5032, where the U.S. Attorney, and it is the certification in this record, that he certifies that, pursuant to the provisions of the Section 5032, et seq., that the instant matter, the offenses charged are crimes of violence that are felony offenses and that there is a substantial federal interest in the case in offenses towards the exercise of federal jurisdiction.

If Congress did not intend juveniles to be charged with criminal offenses, that certification would not be necessary, and yet here we are because it is a criminal offense.  We charge people through information with criminal offenses all the time.

I can't question why Congress decided this was the procedure, why informations would be required first before an indictment.  I don't know.  I even tried looking at the

procedural history in Congress and I really couldn't figure that out.

The point is that it allows for a criminal prosecution to commence.  It then becomes the responsibility of the district court to decide whether it will remain juvenile status, such that a bench trial occurs, the judge will decide whether or not that delinquent has committed the crime, and then what offenses and what sentence he will receive.

Again, if this was not criminal, the section that provides, 5037, wouldn't provide with supervision or detention, incarceration for the juvenile if this wasn't a criminal proceeding and, in addition, it wouldn't provide the ability to transfer to adult status where the adult rules and the adult sentencing criminal scheme would apply.

I only mention that because I do disagree with Mr. Kuhl on that.  I don't know why Congress did it this way.  It is certainly not the way it is done in state court.  But here we are.

I am prepared to present to the court today the facts and the evidence that would constitute probable cause so that the court can make that finding, in addition to any bond finding or bail finding that the court wishes to do.

THE COURT:  OK.  Let's move forward, then, with that understanding of the issue that we may have to deal with.  Let's go ahead and treat it as a preliminary hearing, in

effect, because it is a combination of preliminary hearing and detention hearing.

MR. KUHL:  Your Honor, just for the record, may I respond to the criminal offense argument?

THE COURT:  Hold your thought on that.

MR. KUHL:  OK.

THE COURT:  Ultimately we will have to tackle it later anyway.

So go ahead and call your witness, I guess.

MS. LOPEZ:  OK.  Your Honor, may I please make a brief proffer before I call the witness to testify about many of these issues just so the court has some background.

THE COURT:  It is fine with me if it is fine with the defendant, because it is treating it as a preliminary hearing.

MR. KUHL:  I'm fine with presenting it.

THE COURT:  Go ahead.

MS. LOPEZ:  Would the court like to know the bases for the jurisdiction in this case or would the court like me to move on to the facts?

THE COURT:  You can move on to the facts.

MS. LOPEZ:  OK.  Thank you, your Honor.

On or about November 2nd, just so that the court is clear, and this will carry through, through this presentation, T, who is a 16 year old, and the victim, who is an 18-year-old female, were United States citizens residing in Titusville, and

at all times relevant to my presentation and the testimony, the victim's father, Christopher, was married to T's mother Shauntel. Therefore, T and the victim were step-siblings.

On or about November 2nd, the victim and her family, to include T, departed the port of Miami, in Miami, Florida, for a one-week cruise around the Caribbean. At some point they made a stop in Cozumel, Mexico.

Now, during this voyage the victim shared a cabin with her 13-year-old half brother, the minor witness, and T, and that cabin was numbered 8343.

The victim's father, T's mother, and two minor female sisters and stepsisters shared a separate cabin across the hall numbered 8341.

Now, on or about November 7, 2027, after members of the ship Horizon, which is a Carnival cruise ship, went into cabin 8343 to clean it and there they found the victim wrapped in a blanket and stuffed underneath her bed, which was the bed closest to the wall of the cabin.

According to the attendants who found her, it appeared that someone had tried to hide her, again, by partially putting her underneath the bed and putting a box of life vests to cover the view of the body from the rest of the room. It also had appeared that the bed had not been slept in.

The Carnival cruise line officials called the FBI, who met the ship Horizon at the port of Miami upon its return

November 8, 2025.

From the dates of November 6, 2025 through November 7th when the victim's body was found, the ship was in the high seas. It had left the port of Cozumel on its way back to Miami.

After the FBI boarded the ship on November 8th, they conducted numerous interviews of the family members, as well as looked at different things that the cruise ship had, including closed-circuit television, and it was revealed that after the family had returned to the ship on November 6th visiting Cozumel, the family met for dinner on the Horizon.

During the dinner the victim stated that she did not feel well, complaining of pain in her mouth due to her braces, and an upset stomach. So she returned to her room, cabin 8343, by herself, and that was captured by the closed-circuit television.

As previously stated, the FBI then looked at the closed-circuit television and it revealed the movements of the victim T as well as the 13-year-old brother, the minor witness.

Now, he had been spoken to by the FBI as well and he stated that he did go into the room for short periods of time during the evening after dinner, and that was corroborated by the closed-circuit television. He did say, though, that after he decided to come back to the room to go to sleep, when he opened the cabin door to 8343, T put his arm out to block the

room entrance from opening and did not allow the minor witness to enter and yelled, wait, don't come inside, saying that he was changing.

The minor witnessed noticed that both the bathroom and closet doors were open and all the lights of the cabin were turned on, which he thought was odd or, excuse me, weird.

T then instructed the minor witness to wait outside of the cabin.  CCTV captures this, where the minor witness then sits outside in the hallway, right outside the door, sitting down for a few minutes before T opens the door and allows him to enter.

The minor witness acknowledged that the last time he had seen the victim inside of the cabin was earlier in the evening when he had gone in for a minute to retrieve something with his friends.

The CCTV provided the following information about the movements of T, the victim, and the minor witness.

At approximately 7:38 p.m., the victim is seen entering cabin 8343, and this is the last time the victim is seen alive by the CCTV footage.

At approximately 7:51 p.m., the minor witness is seen walking down the hall towards 8343 with two friends.  He enters the room and quickly exits.

At some point in that evening, at about 7:35 p.m., T is entering the cabin.  So T enters the cabin three minutes

before the victim enters the cabin, and he is not seen exiting the cabin again by CCTV until 10:13 p.m.

Upon opening the cabin door at 10:13 p.m., T is seen looking left and right down the hallway, appearing to check if there is anyone in the hallway, and then he walks outside of cabin 8343.  This is the only time in which T does that action when exiting the cabin door.

Between 10:23 and 10:49, T is observed entering and exiting the cabin approximately two more times.

Then at 10:53 p.m., T exits the cabin and is observed placing the privacy sign on the cabin door and reenters the cabin at 11:07 p.m.

Then from 11:21 p.m. to 11:23 p.m., the minor witness is observed entering and exiting cabin 8343.  This is where he tells FBI that he does not see his sister.  He sees her at that initial entering that occurred at 7:51 p.m.

After the minor witness leaves at 11:23 p.m., at approximately 11:31 p.m., T exits the cabin and reenters at 11:44.

Then at 12:09 a.m., in the morning now on November 7th, the minor witness is seen entering the room, is quickly observed not being let in, and then he waits outside in the hallway for a couple of minutes until he reenters the cabin.

The CCTV also showed that T exited the cabin a couple

of times on the morning between the times of 9 a.m. and 11:30 p.m. -- excuse me, a.m., outside of the same cabin.

During one of those, specifically -- and I'll get back to the time in between -- but 11:24 a.m., the Horizon state room attendant goes into the cabin and then she is seen quickly coming out and getting her supervisor, who also comes into the cabin, and that is when they discover the victim's body.

At approximately 11:27 p.m., T is seen walking by the hallway towards 8343, and as he walks by the cabin, he makes no effort to look and see what is happening inside, even though so many people are still inside the cabin with the door open. He looks straight ahead and walks away.

Basically, the CCTV --

THE COURT: Let me stop you. You said 11:27 p.m. I assume you meant --

MS. LOPEZ: A.m. I apologize. Yes. On November 7th.

CCTV footage essentially reveals that the victim never left cabin 8343 after she entered it at approximately 7:38 p.m. on or about November 6, 2025.

Now, the body-worn camera footage from the Horizon's security officers corroborated the cabin attendant's description of how the victim's body was found. Meaning it was wrapped in a blanket or a bedsheet, stuffed underneath the bed with that box of life vests or life preservers placed on top of

it to conceal its position.

Now during the course of the FBI's investigation onboard the Horizon, after they viewed the CCTV, they tried to locate the victim's cell phone, because the family had mentioned that she was never without it.  They could not locate it inside of the room.  The cruise ship people had also indicated that they didn't take the phone or see one in any way.

The FBI then eventually looked around and decided to look in the Horizon's lost and found office, and the victim's cell phone was found there.  The circumstances surrounding it being, there was that a Horizon crew member found it in a trash bin located in the rear or aft of the ship, on the starboard side, meaning the right side of the vessel, which I am going to call the trash bin from now on.  It appeared that it had been seriously damaged, as if it had been smashed, and the screen was broken.

The FBI then looked back at the Horizon's CCTV footage from the morning of November 7th to see how that phone could have gotten out of the room if we know the victim never left the room after 7:38.

They found that T leaves the cabin at approximately 9:26 a.m. and he returns to the room at 9:48 a.m.  Then it reveals that at 9:50, T leaves the cabin.  He is observed holding something in his left hand, and it looks like he's

reaching into the sweatshirt front pocket.

After he leaves, he is then observed walking to the midship lobby, because cabin 8343 was towards the front of the ship, and he takes the stairs to deck 10, then walking to the aft or the rear of the ship through the Lido Marketplace restaurant.

The CCTV footage shows that at 9:52 a.m., T is observed reaching into an area near the trash bin where the victim's cell phone is found.  Now, the trash bin is not depicted directly by the CCTV footage, but it shows that T stayed in the area by the trash bin for approximately 22 seconds.  He is then observed returning by the same route which he got there at approximately 9:53, until he enters cabin 8343 at 9:55.

The FBI contacted the cruise line's information technology officer to be able to trace the movements of the victim's cell phone that morning, and the following information was given to them and was provided that showed, basically, throughout the cruise ship as people are using the internet, in order for them to use the internet, the ship has routers throughout the ship, and people's phones, once they enter into the cruise ship's wi-fi system, will connect to these routers. That information, meaning the client association history, the MAC address and the path connections to the Horizon's wireless networks for any particular phone or computer is kept in their

care, custody, and control as are records in the regular course of business.

The tracing of this information provided the following:  At approximately 9:26, when T is seen exiting cabin 8343 on CCTV, as I mentioned, the victim is not seen.  Then at 9:27, when CCTV shows him on deck 10 in the Lido Marketplace, the victim's client association history data with the cruise ship reveals that T and the victim's phone, meaning the victim's phone is taking the same route towards the aft of the ship as the victim's phone, is hitting all of the wireless networks or access points on that route.

At approximately 9:29 a.m., the victim's phone connected to routers near deck 10 at the Lido Marketplace of the Horizon.  The client association history showed that the victim's phone is taking the same path of travel as T is in this area as he is walking through the Lido Marketplace on the CCTV.

At approximately 9:32 a.m., T is seen smoking in the area of deck 11.  Then at 9:34, the victim's phone connected to routers near the smoking area on deck 11, on the starboard side of the Horizon, at the same place where T is seen smoking a cigarette.

At approximately 9:39 a.m., the victim's phone connected to routers near deck 12, the jogging deck, which is on the port side of the Horizon.  At the same time T is

captured by CCTV cameras walking on deck 12 at the jogging track port side. Then it shows that T is walking on the jogging track until approximately 9:46 a.m.

At approximately 9:48 a.m., T is observed entering cabin 8343, and then the victim's phone, at 9:50, is connected to the router in cabin 8343.

At the same time, at approximately 9:50 a.m., T is then captured exiting 8343 and walking to the midship lobby. This is when he is then observed taking the stairs to deck 10 and then walking to the aft of the Horizon, again, through the Lido Marketplace.

While he is doing so at 9:52 a.m., T is observed reaching the area of the trash bin. While the trash bin, again, is not directly covered by the CCTV footage, it shows that T stays in that general area for approximately 22 seconds. And then at 9:53 a.m. he is seen, observed by the CCTV, returning by the same route.

At approximately 9:55 a.m., he is then seen entering the cabin. At that exact same time the victim's phone is located at deck 10, on the starboard side, near the router that is later found to be close to the trash bin located in the area.

A search warrant was obtained by the FBI for T's phone, and the victim's phone was also searched. The phones did not reveal any information about the victim's murder nor

did it reveal the information about the relationship between victim and T.  It neither showed a good nor a bad relationship between the two.

The medical examiner, Dr. Jonathan Kanakaraj, for the Miami-Dade Medical Examiner's Office also arrived on the Horizon in order to conduct his investigation.  At that point the victim's body was moved from its location after it was documented and then he began to undress the victim and to prepare to take her to the medical examiner's office.

After they undressed the victim to conduct their preliminary examination, Dr. Kanakaraj observed that the victim's underwear was worn in an unusual manner, specifically, the underwear's waistband.  It will be noted she was fully clothed with a sweatshirt and sweatpants.  So they had to remove that to see the underwear.  The underwear's waistband was observed to be bunched up, twisted, and folded up.  The underwear was further found, meaning the section that covers the vaginal entry area, that part of the underwear was found to be inserted inside the victim's vagina.

Based on his observations of the underwear and the way it appeared on the victim's body, Dr. Kanakaraj opined that there was an indication, from this preliminary examination, of possible sexual assault but would need to confirm with further examination.

Therefore, on or about November 9th, he conducted

the autopsy of the victim.  During the autopsy, Dr. Kanakaraj first observed petechiae, that is, the tiny pinpoint red spots under the skin caused by bleeding from small capillaries, and he noticed this petechiae in the victim's eyes and face. Significant areas of bruising were found on the sides and rear of the victim's neck area, specifically more on the left side. There was also significant bruising of the victim's left ear. A significant amount of grayish viscous liquid was present in the victim's vaginal canal.

Now Dr. Kanakaraj at that point noted that the petechiae and bruising were indicative of possible mechanical asphyxiation.  That means strangulation.  And he additionally collected a rape kit from the victim as well as her nail clippings, which is standard.

On or about November 10th, Dr. Kanakaraj contacted law enforcement, stated he had ruled that the victim's death was due to mechanical asphyxiation, most likely from a chokehold, with enough force that such bruising and blood were in the ear area and that the manner of the victim's death was homicide.

The final tox report for the victim found there were therapeutic amounts of Butalbital, a medication with acetaminophen, aspirin, caffeine and codeine, used primarily to treat tension headaches was present in her system but not found to be a contributory cause of death.

The rape kit and the fingernail clippings were sent to the FBI laboratory in Quantico for testing.

On or about November 24th of 2025, they informed law enforcement that -- all these reports have been provided to the defense, so the court is aware -- that the swaths from the victim's rape kit tested positive for DNA, specifically to this case.

Swab No. 4, a swab from inside the vaginal canal, tested positive for male sperm, in addition to the victim's own DNA.  And swab 5, a second DNA swab of the victim's vaginal canal, while negative for sperm, did test positive for male DNA, in addition to the victim's own DNA.

Based on these preliminary results, the FBI obtained a search warrant for T's DNA, which was signed by a district court judge in the Middle District of Florida, and two DNA swabs were taken from him.  DNA swabs were also obtained from a minor who lives out of state with whom the victim had sexual intercourse while on the cruise, who I will refer to as minor witness two.

The FBI laboratory compared the DNA standards from T and minor witness two to the male DNA profile found in the two vaginal swabs.  The results were as follows:  As to swab 4, the one that tested positive for sperm, minor witness two was excluded as a contributor.

As I mentioned before, the victim's DNA, the female

DNA profile, did belong to the victim and was present in that mixture.

The result as to the main DNA that was obtained from that sperm was that it is 120 sextillion times more likely that the victim and T were the contributors of that mixture than if the victim and an unknown, unrelated person to T, were the contributors of the mixture. Therefore, the results from this item had very strong support for the inclusion of T as the contributor of the male DNA in the mixture.

As to swab 5, the swab that came back sperm negative but positive for male DNA, minor witness two was excluded as a contributor. The female profiles, as I mentioned before, belonged to the victim.

The result was that it is 1.2 septillion times more likely that the victim and T were the contributors of the mixture than if the victim and an unknown, unrelated person were the contributors of the mixture.

Therefore, the results from this item had very strong support for the inclusion of T as the contributor of the male DNA in the mixture.

Subsequent to these results, Dr. Kanakaraj opined that all the evidence he found on the body, as well as the evidence from the DNA, were consistent with a sexual assault occurring and that the sexual assault had happened antemortem, that is, before death.

Delvalle – Direct

I will now call special agent Andrew Delvalle, from the FBI, to testify.

THE COURT:  OK.  Go ahead and call the agent.

THE DEPUTY CLERK:  Thank you.  Please raise your right hand.  Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

THE DEPUTY CLERK:  Can you please state your name and spell it out for the record and what agency you represent.

THE WITNESS:  Sure.

THE DEPUTY CLERK:  Thank you.

THE WITNESS:  May I have a seat?

THE COURT:  Yes.

THE WITNESS:  Andrew Delvalle.  A-N-D-R-E-W.  D, as in David, E-L, V, as in Victor, A-L-L-E, and I represent the Federal Bureau of Investigation.

MS. LOPEZ:  May I proceed?

THE COURT:  Go ahead.

ANDREW DELVALLE,
    called as a witness,
    having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MS. LOPEZ:
Q   Special agent Delvalle, what is your current position and

what squad do you work in at the FBI?

A   I'm currently special agent with the FBI and I work on the international violent crimes squad.

Q   Does that squad have the responsibilities of investigating crimes that occur outside the territorial jurisdiction of the United States, such as cruise ships?

A   Yes.

Q   Were you the one or the agent who was assigned to be one of the two case agents in this matter involving the death of the victim?

A   I was.

Q   Were you present in the courtroom when I read my proffer to the court?

A   I was.

Q   Is my proffer accurate and true, to the best of your knowledge?

A   Yes.

Q   Is there anything in that proffer that you would change or want to correct as you sit here this morning?

A   No.

MS. LOPEZ:  At this time, your Honor, I will allow the defense to cross-examine since he's adopted the proffer in its full.

THE COURT:  Defense.

MR. KUHL:  Thank you, your Honor.

Mr. Cohen is going to conduct the cross-examination.

CROSS-EXAMINATION

BY MR. COHEN:

Q   Good morning, agent.

A   Good morning.

Q   Based on the time line that we just heard from the government, almost 16 hours passed between the time that the victim, who I am going to refer to as A, just because it's simpler --

A   Sure.

Q   -- was last seen entering her cabin and the time that her body was discovered.  Is that accurate?

A   Yeah, I would say so.

Q   There is no direct evidence that has been developed during the course of your investigation that indicates the precise time of death, is there?

A   No.

Q   OK.  There are obviously no cameras inside the cabin that reflected what was occurring there, right?

A   That's correct, yes.

Q   And you were present at the autopsy along with the doctor who performed it, is that accurate?

A   I was, yes.

Q   At no time did the doctor indicate to you a precise time of death, did he?

Delvalle - Cross

A   He did not.

Q   So again, we're talking about over a 16-hour period of reference in this case.  Is that fair?

A   Yes, that's fair.

Q   OK.  So we haven't seen the videos, obviously.  We are early on in the case.

How would you describe the quality of the images?

A   I would say very good.

Q   Going back to the time line.  So between 7:30 when A enters the room and 12:09, that you've been or the government's been referring to as minor witness one -- let's refer to him as C.

That's his first initial, correct?

A   Sure.

Q   Again, it's a little easier to say or deal with.  OK.

So during that period of time T, my client, is in the cabin.  He's been in there a majority of the time, is that correct?

A   Yes.

Q   But he's not the only person in the cabin during that period, right?

Let's put A aside for a second.  C was also in the cabin for at least short periods of time?

A   At most two minutes, but yes.

Q   But also he was there twice?

A   Twice, yes.

Q   OK.   One at 7:51, where he told you later or told law enforcement later that he saw his half-sister there at the time, right?

A   Yes.

Q   And then somewhat later, at 11:21 he goes back again, and he claims later that he doesn't see his half-sister there at the time, right?

A   Yes.

Q   OK.   So now is there any indication at all that after 11:21 when he goes back to the cabin and doesn't see A there, he tells his parents or his grandparents, who are also on the cruise, about his sister not being in the cabin?

A   Can you repeat the question?   I'm sorry.

Q   Maybe it was the way it was worded.   I'm sorry.

A   No.

Q   11:21 he goes back in the cabin, correct?

A   Correct.

Q   He knows that his sister had been in the cabin the first time he was there, right?

A   Yes.

Q   He also knows that his sister, his half-sister, to be exact, had excused herself from dinner because she wasn't feeling well, correct?

A   I'm not sure about if he knew that or not.

Q   Well, wasn't he at the dinner, according to your

investigation, with the rest of the family when she excused herself because she wasn't feeling well because of her braces?

A   Yes, but I'm not sure if she shared it with everybody at the time or just her parents.  That I'm not really sure about.

Q   But in any event, his sister's in the cabin earlier.  It's getting close to midnight.  She's not there.  He doesn't alert anybody to the fact that she's not there.  Is that fair?

A   Yes.  Sure.

Q   And he also doesn't alert anybody to the fact that there is something unusual about the appearance in the cabin.  Is that also fair?

A   That's fair.

Q   OK.  According to the proffer, some bedding, whether it be sheets or blankets, were stripped from the bed, one of the beds, right?

A   At what point?

Q   Sometime during the course of that almost 16 hours, some bedding was striped off of the bed.

A   No.  The bedding was striped from the bed by the cabin attendant.

Q   Well, wasn't the body found wrapped in a blanket or sheets?

A   Yes.  It was my understanding that those were blankets that were typically in a closet.  They were extra blankets.

Q   There was also some indication that there were life vests in an unusual posture beside one of the beds, correct?

Delvalle - Cross

A   I wouldn't say unusual posture.  They weren't there originally.

Q   So there was nothing unusual about the appearance in the room?

A   Well, the life vests were always found on the other side of the bed, not under her bed.  So those life vests were moved to be placed in front of the body because they were never there throughout the cruise.

Q   OK, but that wouldn't have been apparent to anybody who wasn't working on the cruise ship?

A   Right.  No.  Yeah.

Q   So if anybody had walked into the cabin who was not an employee or an attendant on the cruise ship, they wouldn't necessarily know that there was anything unusual there?

A   I would agree with that.

Q   And then the proffer was that C returns to the cabin again at 12:09 a.m. on that Friday morning and then remains in his cabin for the next nine or so hours.  Is that also accurate?

A   Yes.

Q   Now when he returns, he claims that T asked him to remain out side because T was changing his clothes, right?

A   Yes.

Q   And that he remained outside for no more than a minute or two?

A   I think it was about two minutes.  Yes.

Delvalle - Cross

Q   And then he gets out of the cabin at about 9:20.

Was that accurate, from what you recall?  You don't have to be exact, but sometime --

A   Somewhere around 9 a.m. I would say, yes.

Q   And again, he doesn't see his sister, or his half-sister, in the cabin, does he?

A   When he --

Q   He doesn't claim to have seen his half-sister in the cabin when he gets up and leaves the cabin at approximately 9 a.m.?

A   Correct.

Q   And again, he doesn't report that to his parents or his grandparents about anything unusual about his sister, half-sister, not being there?

A   He didn't find it unusual.

Q   So this is an inside cabin?

A   Yes.

Q   I have never been on the ship, but been on some cruises.

Inside cabins are generally fairly small?

A   Yes.

Q   And there were three people staying in that cabin?

A   Yes.

Q   So although C thought that it was unusual that T would not let him in the room, he doesn't know what is going on inside the cabin at that time?

A   No.

Q   OK.  And certainly if at that time T was in some way trying to conceal the body, he would have had one or two minutes to find the blankets from the cabin, wrap A inside of them, carry her from the bed, put her under the mattress, and put the life vests where they were found later.

A   No, I wouldn't -- I would disagree with that.

Q   OK.  What part would you disagree with?

A   Well, he had been with A for about two hours, from 7:30-ish to about 10 p.m.  When he returned to the room later on that evening, at around 11 something -- I'm sorry, I don't remember the times -- there is nothing telling me that that's when he decided to hide the body.  He could have done that right before, during those two hours, and he was just finishing up whatever he needed to finish up in those two minutes.

Q   OK.  So C has a key to the room, right?

A   Yes.  True.

Q   He could have returned at any time, right?  Yes?  You have to answer.

A   I'm sorry.  I apologize.  Yes.

Q   And obviously T doesn't know C would be coming back to the room?

A   He does not, no.

Q   So during that period of time that you just mentioned, at any time T could have walked into the room -- I mean C could have walked in the door, right?

A    Definitely.  Yes.

Q    And still, what I described would have taken more than just a couple of minutes to take place, right?

A    I would say so, yes.

Q    OK.  So have you had an opportunity to read the autopsy report?

A    Somewhat, yes.

Q    The report indicates that A weighed 109 pounds at death.

Do you recall that?

A    It seems about right.

Q    And also in terms of moving the mattress, you recall that the steward that first went into the cabin had to get help to lift the mattress because it was so unruly?

A    Well, she was a female, a small female, but yes.

Q    He is a small male, right?

A    Sure.  Yes.

Q    OK.

THE COURT:  Just so I'm clear, you said that T was in the room from 7:30 until about 10, is that right?

THE WITNESS:  Yes, your Honor.

THE COURT:  At what point did C try to get into the room?

THE WITNESS:  A little after midnight.

THE COURT:  So it was after.

THE WITNESS:  Yes, sir.

THE COURT:  Was there any attempt to get into the room between 7:30 and 10 by C?

THE WITNESS:  One time when he showed up with his friends, and he was in there for about 30 seconds, and then he left with his friends.  At that time T and A were also in the room, and C confirms that he saw A at around 7:50 p.m.  I can't be exact on time, but it was around 7:50 p.m.  So from 7:50 p.m. until about 10 p.m. it was just T and A in the room.

THE COURT:  I see.  And is there a video capturing friends going into the room?

THE WITNESS:  They did not go into the room.  He was in there for 20 seconds.  He just went to go pick something up, was my understanding.

THE COURT:  OK.  So it is just him who goes in and then comes out?

THE WITNESS:  Yes, your Honor.

THE COURT:  OK.

BY MR. COHEN:

Q   Just to clarify, between 7:38 when A goes into the room, the last time that she's seen, and approximately 12:09 when C goes into the room for the night, during that time period he had actually entered the room twice, is that correct?

A   My recollection, yes.

Q   He entered the room first at 7:51, and that's when he claims that he did see A inside?

A   Uh-huh.

Q   Right?

A   Yes.

Q   And then he enters the room again at 11:21, and at that time he claimed later he did not see A inside?

A   That's my recollection.

Q   So there were several times overall that he was in the room that evening?

A   Twice.

Q   And then the last time he went in, he went to sleep, or he said he went to sleep?

A   Yes, sir.

Q   The --

        THE COURT:  Just so I understand, again, so C went into the room after 10:00 how many times again?

        THE WITNESS:  Just one, your Honor.

        THE COURT:  And how long was he in the room?

        THE WITNESS:  Under two minutes.

        THE COURT:  OK.  And is it your theory that the death occurred already at that point?

        THE WITNESS:  Yes, your Honor.

        THE COURT:  Why do you say that?

        THE WITNESS:  Because he didn't see A when he went into the room at all, and she had never exited the room per CCTV.

THE COURT:  So the theory is that she was hidden at that point in time and so when C went into the room, he couldn't see her.

THE WITNESS:  Yes, your Honor.

BY MR. COHEN:

Q   So it seems like your supposition is, based on what C told you, that he didn't see his sister at the time, correct?

A   My supposition on what?

Q   Your response to the court's question.  You thought that when C entered the room at 11:51 that A had already been killed, right?

A   Yes.

Q   And a significant part of your basis for that conclusion is what C told you, that he had not seen his sister at 11:51, right?

A   That is partly true.

Q   What if C was lying, does your theory fall apart then?

A   No, I don't think so.  There was only a period of time, a significant period of time, where all of this could have occurred, which would have been from 7:50 something until about 10 p.m.  Other than that, the ins and outs of both T and C were very insignificant time frames.

Q   Wasn't C in the room from 12:09 to 9:50?

A   Yes.

Q   So that's nine hours?

A    Yes.

Q    Nobody else has given you information about what occurred during that time period, right?

A    No.

Q    Nobody else has given you any indication whether or not A was alive or dead when C entered the room at 12:09, have they?

A    As far as eyewitnesses, I don't know.

Q    Well, you're the case agent.  Have you been given any information about whether or not somebody else was in the cabin during that period of time?

A    No.

Q    OK.  And the medical examiner hasn't been able to tell you whether or not the death occurred before 12:09 or after 12:09?

A    No.

Q    So again, it goes back to whether or not you believe C, a 13-year-old half-brother of the decedent, is that right?

A    Again, no.  My understanding, A also had an iWatch that monitored her heart rate and so forth, and that iWatch stopped working between the time period of 7:50 p.m. to 10 p.m.  It wasn't monitoring her heart rate anymore.

Q    Did you find the watch?

A    No.

Q    Had you had the watch, you could have had it tested for accuracy or whether it was broken or functioning properly, right?

Delvalle - Cross

A    No.  We downloaded her phone information and that's where we got that information from, from her iPhone.

Q    But again, you don't know whether or not the watch was functioning properly?

A    It was functioning fine up until around that time period.

Q    Do you know whether she took it off?

A    No.

Q    Did you find it?

A    We did not, which we thought was odd.

Q    OK.  And certainly after that period when it stopped working, not only was C in the room briefly, at about 11:50, but was in the room for the rest of the night after 12:09, right?

A    No.  The iWatch stopped functioning sometime between 7, late 7:50, to 10 p.m.  I can't tell you the exact time because I don't remember, but it was during that time period.

THE COURT:  On the issue of the watch, at what point was it tested?  In other words, at what point was this inquiry conducted about the information from the watch?

THE WITNESS:  We received a search warrant for A's phone, and part of the information that we received was her Apple Health.  I really don't remember what it's called, but it is basically an app that connects to her iWatch and it monitors heart rate and steps, like a typical fitness watch.  During that time period that watch stopped recording information.

THE COURT:  And had it been, do you have recording of information from the beginning of the cruise as an example?

THE WITNESS:  I believe the watch had been monitoring throughout the cruise.

THE COURT:  OK.

THE WITNESS:  I didn't review the information completely.  That was the other case agent.  But I was informed that that watch stopped working during that time period.

THE COURT:  If she were to take off the watch, though, at some point, that would also cause it to stop working?

THE WITNESS:  Yes.  The interesting part is that we could not find that watch, which was odd.  We did an extensive search of that cabin and both her watch and the cell phone were missing.

THE COURT:  The area where the watch was found -- excuse me -- the phone was found, was that searched for the watch?

THE WITNESS:  No.

THE COURT:  OK.

BY MR. COHEN:

Q   When -- you had spoken to T after you boarded the ship the next day, correct?

A   Could you repeat that?  I'm sorry.

Q   Law enforcement spoke with T after the ship docked in Miami and the FBI boarded, right?

A    Yes.

Q    Was he searched?

A    I'm not aware.

Q    But no watch was found on him?

A    No.

Q    Did anybody go back to the lost and found after this determination to see if maybe the watch had been put there at the same time the phone was?

A    So we went to lost and found.  There was no iWatch there.

Q    So you have the fact that a watch may have stopped at about 10 something, without knowing why it may have stopped, and the word of a 13 year old to suggest that this incident, the homicide, had to have occurred before 12:00.  Is that pretty much accurate then?

A    I would say that's a good portion of what we have, yeah, as far as the timing.  Sure.

Q    The timing is critical in this case, right?  I mean, you're relying on the closed-circuit TV to try and determine when A was killed.

A    Yes.

Q    OK.  So the whole reason that we have gone through the whole time is because timing may be critical, right?

A    Timing is part of what occurred during that day, sure.  Of course.

Q    So certainly if she was killed at 2:00 is a different

Delvalle - Cross

situation than if she was killed at 10:00, right?

A   How so?

Q   If she's killed at 2:00, there's two other people in the room, right?

A   Yes.

Q   If she's killed at 10:00, maybe only one?

A   Yes.

Q   So timing is crucial in this case?

A   Yes.

Q   Now, somebody -- I don't know if it was you or another person from law enforcement -- also spoke to A's father, who is T's stepfather, correct?

A   Yes.

Q   And he told you that there were issues between C and A even before they got on the ship, right?

A   I don't recall.

MS. LOPEZ:  Which one are you going to read from?

MR. COHEN:  The 302 you provided.

MS. LOPEZ:  Right.  OK.  Got it.

BY MR. COHEN:

Q   OK.  So it looks like on January 15th that you had a meeting, you and agent Pitts?

MS. LOPEZ:  I'm sorry, your Honor.  This is improper refreshment of recollection.  The agent's testimony was he doesn't recall.  I would object to impeachment at this point.

If he said he didn't recall, the appropriate procedure is for counsel to provide him with that 302 for him to review it and if his memory is refreshed, he can testify.

THE COURT:  This isn't a trial, remember.  So whatever is most efficient in terms of presenting the fact, that is most relevant to me.

Obviously, the witness can always ask a lawyer to see what he is looking at if he wished to confirm the question.  OK.

MR. COHEN:  If I could just have a moment, your Honor.

(Pause)

THE COURT:  While he's doing that, while he's looking at it, can you just respond directly to the question about isn't it possible that it was C who may have been involved if the murder didn't actually occur until after midnight?

THE WITNESS:  I would argue not because it was T's semen that was found inside of the victim, not C's.

THE COURT:  That assumes, of course, then, that the person who committed the sexual assault is the same person who committed the murder.

THE WITNESS:  That plus the timing.  They were there by themselves for those two hours.

I would also argue that there was no DNA of C found anywhere on the victim or or anything like that.

BY MR. COHEN:

Delvalle - Cross

Q   OK.  So let me follow up on the court's question, which I was going to get to eventually anyway.

During the time of the autopsy, was the assistant medical examiner able to determine how long after the intercourse did the death occur?

A   Not that I'm aware of.

Q   Was the assistant medical examiner able to determine whether the same person who was involved in the intercourse with A was the person who killed her?

A   I don't think they made that determination.

Q   Thank you.

The proffer described marks and bruises to A's neck. Was any attempt ever made to lift DNA from areas of her body to indicate who may have strangled her?

A   I'm not sure.  Of that I'm not sure, no.

Q   Again, you're the case agent.  You would have been privy to that information if it in fact existed?

A   Yeah, I would say so.

Q   And you don't know of any information to that effect?

A   No.  I thought you said there was an attempt made.  I'm not sure if there was an attempt made.

Q   Well, you would be the one who would have told somebody to go ahead and get the DNA lifted, right?

A   I believe the medical examiner does their own examination. How they do it, if they tried to recover DNA samples from the

Delvalle - Cross

neck or anything, that would be up to them.

Q   Have you ever heard of a medical examiner lifting DNA from a body?

A   I don't know.

Q   How many homicides have you investigated?

A   So we investigate murders of U.S. citizens overseas.  So we've investigated quite a few.  I can't tell you a number right now.

Q   OK.  How many homicide investigations have you been the lead case agent on?

A   None.

Q   None.  This is the first?

A   Yes, sir.

Q   So going back to the proffer, there was quite a bit of very specific information about A's phone.

        Do you recall that?

A   Yes.

Q   And the proffer contained, and you verified, at 9:50 a.m. T was seen on video leaving the cabin with his hands somewhere stuck inside his sweatshirt.  Is that fair?

A   Yes.

Q   So between 9:26 and 9:48, even before then, he was also seen walking around the ship, right?

A   I believe so, yes.

Q   And the routers that the prosecutor described were in

effect and working at that time, right?

A    My understanding is.

Q    And it shows that at least the path of the phone was somewhat similar to the path that T was walking?

A    Yes.

Q    Now during the time that he was doing this walk, he went up to the 12th floor, the 12th deck, right?

A    I believe so.

Q    OK.  And the 12th deck was the jogging deck, right?  There was a jogging path or jogging course there, right?

A    I don't recall.

Q    Would looking at your report, or do you have there the search warrant, or your case outline assist you?

A    Yes.  That would be great.

        MR. COHEN:  If I may, your Honor.

        MS. LOPEZ:  Is that the case overview?

        (Pause).

        MR. COHEN:  Actually, it is the search warrant affidavit.

        MS. LOPEZ:  OK.

BY MR. COHEN:

Q    You were the affiant on the search warrant affidavit for T's phone, correct?

A    Yes, sir.

Q    I am going to show you your affidavit.

A    Thank you.

Q    Page 9, paragraph F.

        MS. LOPEZ:   Thank you.

Q    I would ask if that refreshes your recollection as to whether or not prior to 9:50 T was on the jogging track on the 12th deck.

A    Yes.

Q    Again, I have never been on this ship.  Usually the jogging track is on the top?

A    Towards the top.

Q    And borders on both sides, correct?

A    Yes.

Q    He could have thrown the phone into the water, right?  He was on the 12th deck.  Did he?

A    No.

Q    So between the time that A's body was found Friday morning and the time that the ship docked in Miami on Saturday, do you know where her body was kept?

A    They kept it in the room in place.

Q    Do you know if they took any special precautions to make sure that there was no decomposition of the body in that time period?

A    The only thing that they try to do is keep the temperature cooler.  That's about it.

Q    Do you know what temperature it was?

A    I do not.

Q    I didn't think so.

During the time, between the time that FBI boarded the ship, I think at about 7 a.m. on Saturday morning, and the time that you all left, about 5:30, were passengers and/or crew allowed to disembark --

A    Yes.

Q    -- in a normal fashion or were they held for a while?

A    My understanding, normal fashion.

Q    During the search of the cabin either by you or by anybody -- I guess they had security officers on the ship -- was there any items found that were consistent with the injuries described by the medical examiner?

A    What do you mean?

Q    OK.   Let me back up and ask this question.

Was the medical examiner able to determine whether the strangulation was by hand or by object?

A    His finding was mechanical asphyxiation.

Q    So was there any object in the cabin that was found that could have possibly caused that type of injury, that you know of?

A    Not that I know of, no.

Q    So there is just one small part of the proffer where the prosecutor indicated that at some point in time T pokes his head out of the cabin, looks left, looks right, and then goes

back in.

Do you recall that?

A   Yes.

Q   His mother and stepfather were staying in the cabin right across the hall, right?

A   Correct.

Q   And later on when there is this commotion in the cabin with the attendant who finds the body, I think the proffer was that T just walks by without looking inside.

Do you recall that?

A   Yes.

Q   Do you know anything about T's mental health background?

A   The only thing I know from the -- I can't remember if it was the mom or the dad told me he had ADHD.

Q   As far as your investigation revealed, even before leaving on the cruise that T and A were living in the same house, right?

A   Yes.

Q   And they were sharing a cabin together with C for the time between Monday when the ship left Miami and Friday or Saturday, Thursday or Friday, whenever the time period the death occured, right?

A   For the duration of the cruise, yes.

Q   Did you have any information from anybody there were any ill-feelings or bad blood between the two of them?

A    No.

MR. COHEN:  I have nothing further.

Thank you, your Honor.

MS. LOPEZ:  May I proceed, your Honor?

THE COURT:  Redirect.

MS. LOPEZ:  Thank you.

REDIRECT EXAMINATION

BY MS. LOPEZ:

Q   Special agent Delvalle, Mr. Cohen asked you several questions about the time line of this case.

Do you recall those questions?

A    Some of them, sure.

Q   And he specifically focused on some of the time line related to the closed-circuit television.

Do you recall those questions?

A    Yes.

Q   So I'm going to start, we're going to discuss that, but let me start with this first question.

Counsel asked you if C, meaning the minor witness who was in the same room or staying in the same room as the victim and T, stated several times that was the half-brother.

Do you know whether or not C, meaning the minor witness, the 13 year old, is that the victim's full brother or her half-brother?

A    I believe it's the -- you know what, I thought it was the

half-brother.

Q   OK.  So they're actually related by blood, correct?

A   Yes.  For sure.

Q   He is not related to T?

A   No.

Q   Other than his father is married to T's mother?

A   Correct.

Q   All right.  You wrote a case overview for this, correct, that you coauthored with special agent Pitts, right?

A   Yes.

Q   And you sent that to me via email, and I have provided it to the defense as your Jencks material.

A   Yes.

Q   You mentioned several times throughout your questions with the defense the following things, and I'm going to go over them with you.

Do you recall the defense's question about the times that C, meaning the half-brother, the minor witness, came in and out of the room from the point in which the victim and T are in there until he enters it for the last time at 12:09-ish in the morning of November 7th?

A   Yes.

Q   Do you recall those question?  OK.

So let's go over that.

MS. LOPEZ:  May I approach the witness, your Honor?

THE COURT:  Yes.

BY MS. LOPEZ:

Q   You mentioned, special agent Delvalle, that you thought that the minor witness, C, entered the room around, you said initially around 7:50 something, correct?

A   Yes.

Q   And then you mentioned that he might have entered again for a second time around 10 something in the evening, correct?

A   I believe so.

Q   So let's look at your case review.

MS. LOPEZ:  This is starting on the page that starts time line of events, November 6th, for counsel's reference.

BY MS. LOPEZ:

Q   Let's look at this.  You mentioned that the victim returns at what time?

A   7:38 p.m.

Q   And when did T enter the room?

A   About three minutes earlier, 7:35.

Q   So by 7:38 p.m. both T and the victim are in cabin 8343?

A   Yes.

Q   Now, what time do you note that C, the brother, enters into the cabin?

A   7:51 p.m.

Q   OK.  And how long is he there, according to your case overview?

A    If I remember correctly, it was about a minute, not even.

Q    And is that the time period when he is seen in the CCTV with his two little friends?

A    Yes.

Q    And is that also the time point when C tells you when you interview him that he sees the victim in the room?

A    Yes.

Q    All right.  You mentioned that after he enters at 7:51 he is there for maybe a minute or two and then he leaves, correct?

A    Yes.

Q    OK.  Now, from 7:51 until the next time you note in your case overview, is anyone seen entering or exiting cabin 8343?

A    No.

Q    What is the next thing that happens at 10:13 p.m., which is approximately about two hours and 20 something minutes after C is seen exiting?

A    T exits the room.

Q    He exits the room.  Now let's go to your time line.

     When is the next time that Connor is seen entering the room?

A    11:21 p.m.

Q    11:21 p.m., and how long does he remain at this point?

A    For about a minute.

Q    So from the time frame of 11:52, let's say if he stayed in the room, entering at 7:51 and leaving around 7:52 or 7:53 p.m.

Delvalle - Redirect

on November 6th, Connor -- excuse me -- C, is not seen entering cabin 8343 until 11:21 p.m.?

A    That's correct.

Q    So that would actually leave T and the victim in cabin 8343 together alone, with no one else around, for approximately three hours and some change?

A    Yes.  Yeah, I would say so.

Q    About an hour and a half, right, about an hour and 20 something minutes?

A    Yes.

Q    When C reenters the room at 11:21 and quickly exits at 11:23, did you ask him if he saw V, his half-sister leave, the victim, he saw her in the room at that time?

A    I didn't ask him, but he was asked and he said he did not.

Q    OK.  So when he enters the room at 7:51, he sees the victim.  When he comes back the second time three-and-a-half hours later, at 11:30-ish or 11:21-ish, he does not see the victim in the room?

A    Correct.

Q    OK.  Then the third time he enters is that last time, at 12:01 a.m. on November 7th, where he ends up having to stay in the hallway for a couple of minutes, correct?

A    Around 12:09, but yes.

Q    Was C asked after he entered the room the third time what he did between the hours of 12:09 a.m. on November 7th to the

point where he leaves the cabin at about 9:20 something in the morning?

A   I believe he was asked and I believe he said he just fell asleep.

Q   Right, because it is the middle of the night, correct?

A   Yes.

Q   And so he says that he fell asleep and then at what time is he seen exiting the cabin 8343 after he enters at 12:09 p.m.?

A   9:20 a.m., November 7th.

Q   And when does T exit that room?

A   Around six minutes later, 9:26.

Q   The victim never enters or exits at any point after she enters at 7:38 p.m. on November 6, correct?

A   Correct.

Q   OK.  So in those three hours -- excuse me.  In reality, it was about three-and-a-half hours that T and the victim were in the room by themselves, correct?

A   Yes.

Q   If you know, is asphyxiation, meaning strangulation, a quick way of dying?

A   No.

Q   It takes quite a few minutes in order to strangle someone to death, doesn't it?

A   Correct.

Q   So would it be fair to say that it would be unusual or

Delvalle - Redirect

strange for C to have been able to strangle his sister in the quick minute that he entered at 7:51 p.m. when he says he sees her still alive?

A    Very unusual.

Q    Would it also not be enough time for the two minutes that he is seen at 11:21 to 11:23-ish p.m. on November 6th for him to have strangled his sister at that time?

A    Correct.

Q    Now you mentioned the Apple watch or the health information, excuse me, for the victim that was downloaded from her phone.

Do you recall those questions?

A    Yes.

Q    Now I want to go over a few of the things as to that point.

You didn't get a search warrant for it, correct?  You actually just downloaded the victim's phone.  You got a search warrant for T's phone, correct?

A    Right.  I got the search warrant for T's phone, correct.

Q    You mentioned that your case agent let you know that the health information had been working throughout the cruise but stopped somewhere in that time frame after 7:38 p.m. when the victim goes back into cabin 8343 for the last time, correct?

A    Correct.

Q    Are you aware of whether or not anyone viewed her text message during that time?

A    Yes.

Q    And was there any information obtained as to when she stopped texting on that evening?

A    Around that same time.  I believe it was before 10 p.m.

Q    OK.  Now --

THE COURT:  Hold on.  Before 10 p.m., what texts did she send?

THE WITNESS:  I'm not aware, your Honor, because I didn't review them, but she was sending texts throughout that day.

THE COURT:  What time did she leave the dinner?

THE WITNESS:  I'd have to review my notes.  I'm sorry, your Honor.

MS. LOPEZ:  Would you like me to provide a copy?

THE WITNESS:  Sure.

I believe it was around 7:30 p.m., 7:20 p.m. she left dinner and went back to her room.

THE COURT:  Are there any texts she sent between 7:30 and 10?

THE WITNESS:  I'm sorry.  She left at around 6:30, 6:35 p.m.

THE COURT:  Are there any texts between 6:30 and 9:30 or 10:00?

THE WITNESS:  I believe there were.  She was trying to get ahold of the individual that she had met on the cruise

ship, but she couldn't get ahold of him.

THE COURT:  So how many texts would you say there were?

THE WITNESS:  I wouldn't want to speculate, your Honor.  I'm not sure.

BY MS. LOPEZ:

Q   Special agent, you know the texts were stopped at some point but you don't know the exact time at which they stopped, correct?

A   I don't.

Q   Counsel asked you some questions about C and his behavior during the evening of November 6 to the morning of November 7th.

Do you remember that?

A   Yes.

Q   It is true that C didn't alert to any unusual appearance in the room or to the fact that the victim wasn't in the room either to his father or to T's mother, correct?

A   Correct.

Q   T didn't alert either one of them either as to anything unusual in the room, did he?

A   No.

Q   T also did not alert that the victim or even the minor witness, C, weren't in the room for long periods of time, did he?

A    No.

Q    What he does do is that he blocks C from entering the room at around 12:09 a.m., correct?

A    Correct.

Q    And then --

THE COURT:  I'm sorry.  I thought C went back into the room at 12:00.

THE WITNESS:  I'm sorry, your Honor.  He attempted to go into the room at 12:09 and T stopped him saying, don't come in, don't come in, and he had -- if you go into the cabin, the bathroom and the closet are right towards the beginning.  He had both doors kind of open so you couldn't see into the room. So he just told him to wait outside, and C ended up waiting outside for a couple of minutes until T let him back in.

THE COURT:  So he waited in the hallway for a couple of minutes?

THE WITNESS:  Yes, your Honor.

THE COURT:  And then at that point he then goes into the room.

THE WITNESS:  Yes, your Honor.

THE COURT:  And then he stays there.

THE WITNESS:  Yes.

BY MS. LOPEZ:

Q    The family mentioned that the victim always had her phone on her, correct?

A    Yes.

Q    And that's why the FBI searched the room for her phone?

A    Yes.

Q    And the FBI couldn't find it in the room, correct?

A    No, we could not.

Q    The data from the cruise ship router showed that the victim's phone was in the same location as T as he was jogging around that track on deck 12, correct?

A    It was hitting that router, yes.

Q    Was C anywhere in that location at that time?

A    Not that we're aware of, no.

Q    When the ship's router information shows that the victim's phone is pinging along the route to the lido deck on deck 10 and going down the stairs, CCTV showed that T was there?

A    Yes.

Q    CCTV didn't show that C was there?

A    No.

Q    When the router information showed that approximately at around the time of the victim's cell phone connecting to the routers in or around the trash bin, did it show that C, the minor brother, was there?

A    No.

Q    Did it show that T was there?

A    Yes.

Q    Did the CCTV show that T was then observed in the area of

the trash bin?

A    Yes.

Q    And that afterwards he left that the victim's phone is pinging in the area of the trash bin?

A    Correct.

Q    When it is pinging there at 9:55, did the CCTV show that T was there?

A    Yes.

Q    And it showed that afterwards, when it is pinging, he is back in cabin 8343, correct?

A    The pinging remains in the trash and T has since left.

Q    At any point did the CCTV show that the minor brother C was in the area of the trash bin when that was occurring?

A    No.

        THE COURT:  Did you do a similar analysis of T's phone?  Did he have a phone?

        THE WITNESS:  Your Honor, he did have a phone, but he didn't have an internet plan.  They didn't pay for his internet plan.  So it wouldn't have been -- my understanding -- I'm not a tech guy -- my understanding is that it wouldn't be grabbing onto the routers because he didn't pay for the ship's internet plan.

BY MS. LOPEZ:

Q    Counsel asked you some questions about the fact that C or, excuse me, that the victim was about 109 pounds, according to

the medical examiner, correct?

A   Yes.

Q   Was she also short or was she tall?

A   She was tall.  I'm sorry.  Short.

Q   About how much would you estimate her height being?

A   5'2.

Q   And counsel asked you whether or not T was a small male.

Do you recall that question?

A   Yes.

Q   You had a chance to view T standing up when he surrendered himself, correct?

A   Yes.

Q   Because you were one of the case agents to whom he surrendered, is that correct?

A   Yes.

Q   About how tall would you estimate T being?

A   5'9, 5'10.

Q   So he was taller than the victim?

A   Yes.

Q   Counsel asked you some questions about whether or not anyone indicated that T and the victim had a contentious or a bad relationship.

Do you recall those questions?

A   Yes.

Q   What was your answer?

A    Not that I'm aware of.

Q    You also spoke, though, at some point in your investigation to the victim's friends and her ex-boyfriend, correct?

A    Yes.

Q    And did the ex-boyfriend tell you any information that was of note during the course of your investigation as to a strange moment between T and the victim?

A    He did.

Q    What did he say?

A    He stated that while they were dating they would talk often via FaceTime at night and they would fall asleep together while they were on FaceTime.  It was just something that they did as a boyfriend and girlfriend.

During one of those FaceTime conversations, he recalls that A had fallen asleep and he was doing some work in his garage or something, but he noticed or he heard a noise coming from A's phone.  He looked and he states that he had seen T trying to get into bed with A.  He was kind of surprised and shocked by it and yelled at T, and then T apparently ran out of the room.

Q    OK.  Did the ex-boyfriend tell you whether or not he informed the victim of what had occurred?

A    He says he did, yes.

Q    And did he indicate what the victim told him in terms of telling her father about what had occurred?

A    Yes.   She said that she had been hesitant about saying anything to the father because she felt that he was, T was a little weird and that he had quite a few knives, so she was a little bit afraid of him.

Q    Now at some point did you follow up with the victim's father about whether or not any of the video surveillance in his home reflected that interaction or that entry into the victim's room?

A    We did.

Q    And what did he tell you?

A    He said that he reviewed the video, couldn't find anything, but that was (inaudible) with the fact the video only lasted 30 days and this incident would have happened a few months prior to the capacity of the video.

Q    Counsel asked you a couple of questions about the room and I guess the state in which it was kept once the victim's body was found.

        Do you recall those questions?

A    Yes.

Q    You answered some questions regarding the temperature at which it was kept, correct?

A    Yes.

Q    OK.   After the point in which the victim's body is found, was the room kept secure and off limits by cruise security, to your knowledge?

A    Yes.

Q    Were the family allowed to enter?

A    Not to my knowledge.

Q    OK.  Was there a first point when they first find the body that the stepmother, meaning T's mother, and the victim's dad do enter the room to try and wake the victim up?

A    Yes.

Q    After that point do any of -- and they're -- excuse me -- removed by the cruise security at that point, correct?

A    Yes.

Q    At any point after that point does the family or anyone else besides cruise security and the FBI have access to cabin 8343?

A    No.

THE COURT:  Is there any record of any other family member trying to reach the victim at any point prior to that time period?

THE WITNESS:  I'm sorry.  I don't understand that.

THE COURT:  In other words, did anybody try to knock on the door to look for her?

THE WITNESS:  So they left her at 6:30 p.m. after dinner.  The next morning she found at 11 a.m.  My understanding is that, from the dad, was that she was 18 years old, she hung out at night during the cruise.  I think she did her own thing.  So they didn't find it odd at the moment yet.

They weren't alarmed, especially the brother is now in the room, that she wasn't there or C specifically, C wasn't really alarmed that she wasn't there because he was under the impression, so was the family, that she was doing her thing.

BY MS. LOPEZ:

Q   Special agent, you mentioned or you were asked questions about the DNA collection in this case -- do you recall that -- from the victim's body?

A   Yes.

Q   OK.  Do you recall Dr. Kanakaraj, besides the swabs taken during the course of the rape kit, swabbing any part of the victim's body for DNA?

A   I don't recall.

Q   Now the victim's body was found in a blanket, correct?

A   Yes.

Q   And it was closed completely when it was found, correct?

A   Yes.

Q   OK.  The clothing and the blanket would have touched her neck area, correct, and her face area?

A   Yes.

Q   At some point did Dr. Kanakaraj, when he discussed the fact that -- his finding is that the victim died from mechanical asphyxiation.  Did he ever indicate to you if he felt that was done by hands or by a chokehold?

A   He indicated chokehold.

Q   OK.  And did Dr. -- excuse me.

The victims, the swabs that were taken as a part of the rape kit, those were swabs from the inside of her vaginal canal?

A   That's my understanding.

Q   They were untouched by the blanket and the clothing that she was on except for the underwear that was shoved into the vaginal canal, correct?

A   That's my understanding, yes.

Q   And the gray viscous fluid that was tested had very strong inclusion that T was the male contributor to that mixture, correct?

A   That is what the report indicated, yes.

Q   Same thing for swab 5, though not positive for sperm but also taken from the vaginal canal, is that correct?

A   Yes.

MS. LOPEZ:  No further questions.

MR. COHEN:  Your Honor, can we have some brief cross, re-cross?

THE COURT:  Five minutes.

RECROSS-EXAMINATION

BY MR. COHEN:

Q   This conversation with the boyfriend, that was never mentioned on direct examination, did you speak with him personally?

A    We spoke, myself and my co-case spoke with him over the phone.

Q    So when he saw whatever he claimed that he saw, it was while he was in some sort of contact or communication with A, correct?

A    Yes.

Q    Was it some sort of -- I'm showing my age -- was it some sort of video communication?  Was it texting?

Well, he said he saw something so he had to actually have an image, right?

A    Yes.  My understanding it was a FaceTime, live videoconferencing that they did often.

Q    So that being said, A must have been on her phone, right?

A    I'm sorry?

Q    That being said, A must have been using her phone, right?

A    Yes.

Q    And they were communicating verbally in addition to being able to see each other, right?

A    At some point during that conversation, yes.

Q    OK.  So if this event happened, then T would have seen that A was on her phone communicating by video and having a conversation with somebody else, right?

A    No.  No, no, no.  This happened when she fell asleep.  She was asleep and they would, as I mentioned earlier, they would fall asleep together sometimes, but this time she fell asleep

first and he was working in his garage.  She doesn't sleep in the same room as T, obviously.  So my understanding of what he saw was she had fallen asleep and then he, T, crept into the, or tried to creep into the bed.

Q   But there was no sexual activity?

A   No.

Q   So it was two half-siblings sharing a bed?

A   I don't know.

Q   OK.  And there is nothing else about your investigation at all that revealed any prior inappropriate activity between T and A?

A   No.

Q   The government asked you a lot of questions after you already saw T from the closed-circuit video but didn't see C.

Were you looking for C's images the same way you were looking for T's?

A   We were looking for both, tracking both, but mainly T.  Yes.

THE COURT:  Have you looked through a search of C's phone?  Did he have a phone?

THE WITNESS:  So the only folks that had an internet connection was A and her parents.

THE COURT:  Well, that is during the cruise.  In other words, did you do a search of C's phone to see any communications between C and the victim?

THE WITNESS: No. No. No.

BY MR. COHEN:

Q The prosecutor asked you several questions about whether or not C would have had time to strangle A.

Do you recall those questions?

A Yes.

Q And she asked you about one minute, about 7:51, and you said there wasn't enough time.

Do you recall that?

A When he was there with his two friends, yes.

Q She asked you about whatever it was, 11:20, 11:50, whether there was enough time, and you said no.

Do you recall that?

A Yes.

Q Was there enough time between 12:09 and 9:50 for him to strangle her?

A I'd say that's a lot of time.

Q Enough time for him to strangle her?

A Enough time.

Q I'm not saying he did or didn't, but it's enough time that he could have, let me put it that way?

A I think it's enough time, yeah, for anybody to. Sure.

MR. COHEN: Nothing further, your Honor.

THE COURT: Thank you very much. You may step down.

THE WITNESS: Thank you.

(Witness excused)

THE COURT:  Any additional evidence from the government?

MS. LOPEZ:  No, your Honor.

THE COURT:  OK.  Any evidence the defense wishes to introduce?

MR. KUHL:  Just argument.

THE COURT:  OK.  Let me turn back to the prosecutor then and let me let you make your argument in support of -- there's two issues.  One, if there's probable cause to charge, and, two, is there a sufficient basis to detain.

MS. LOPEZ:  OK.  I'll begin with the probable cause argument, your Honor.

I think that, again, probable cause is not beyond a reasonable doubt.  That's not where we're at.  It is, is it more likely than not that this defendant is the one who committed the crime, and I think that the evidence here does, in fact, show that.

Specifically, this victim was in her room by herself with this defendant for at least three-and-a-half hours between the last time C enters the room with his two friends, at 7:51.

THE COURT:  I thought the friends didn't go in the room.

MS. LOPEZ:  Excuse me.  When C enters, when the friends are outside, excuse me, at 7:51 and from the time he

enters again for a brief two minutes at 11:21 p.m. to 11:23 p.m.  That is more than sufficient time for this defendant to have strangled the victim, after sexually assaulting her, and then hiding her body.

The evidence just doesn't show that C would have had enough time during that time period.  What the evidence does show is that in that same time period, though the agent could not recall the exact moment, but the victim's health information stopped showing her pulse and the victim's phone is no longer used by her in that time period.

So I posit to this court that there is probable cause to believe that the victim died in that three-and-a-half hour period, not from the hours of 12 midnight to 9:28 p.m. when C, the little brother, leaves the room.  That is just not supported by the evidence given what the agent has testified to here today.

In addition to that, it is not C -- who is, in fact, blood related to her -- it is not C who had her phone or is traveling with her phone.  It is this defendant.

The family tells the FBI that she always has her phone on her.  If the phone was found by T and there is a real concern as to where she was, why didn't he give it to the parents, why didn't he attempt to find her to try to give it to her.  Instead, he takes it out for a jog on the 12th deck around the thing and he goes back to the room, and then, after

he is in the room for a few minutes, he takes the phone and he takes it to the area where it is found by a cruise ship employee in the trash can.  Not with the victim, not with the parents, not in the lost and found, but in the trash can.

That is an attempt and I believe it is probable cause to believe that this defendant tried to throw that evidence or get rid of it in some way.  Regardless of whether or not he had the opportunity to discard it in other places, he clearly discarded it in the trash bin near the lido deck, where he is seen on CCTV walking with it as it is pinging on the routers on the same track and in the area where he deposits it.  And then as he travels back, it stays in the area of the trash bin while he goes back to the room.

When the body is found and he walks past the room, it would be common sense for someone to be like why are there people in my room that I don't know.  Instead, he just walks right by despite the commotion, when CCTV shows that this poor cabin attendant has now gotten her supervisor and cabin security to go into the room.  The ruckus doesn't call his attention.  He just walks right by it.  That is because he knows what is in the room, because he hid the body in the room.

The body wasn't found in a way that maybe it fell off the bed.  It is fully clothed, despite the fact that his semen is inside of her, with the underwear shoved into it, and I will posit that that is clear evidence of a sexual assault.  No

person in a consensual relationship will leave their underwear on for someone to penetrate them with the underwear going in.

Then he wraps it in a blanket and shoves it underneath the bed.  That didn't happen by mistake.  That happened because someone caused it to happen, someone with enough time to be able to wrap the body of a 5'2 girl, with a 5'9 or 5'10 brother, who is already in puberty and is already developing his muscles and everything necessary to complete such a task from a petite girl.

Then the box of the life vest is found on top.  Again, despite the fact that it is usually located in the middle of the room, it is now on top in the area where the victim's body as if to hide it.  That is not a coincidence.  It didn't fly or crawl over there by itself.  It was placed there by somebody, somebody who had the time to do so.

So the evidence in this case clearly shows, and I posit to the cause that it is probable cause, more likely than not, that this victim went into the room at 7:38.  This defendant was already in there.  After C, the little brother leaves, after being in the room for a couple of minutes at 7:51, for three-and-a-half hours no one enters or exits the room.  It is only T and the victim.  Sufficient time for him to assault her, sufficient time for him to wrap her body, sufficient time for him to try and get it underneath the bed.

When we know that she has a therapeutic amount of a

sedative in her because she complained that she had pain because of her braces, and we know that she took that sedative because there was a therapeutic amount of that Butalbital in her system.

Then, after those three-and-a-half hours, right, and in those three-and-a-half hours, he's coming in and out of the room. Nothing in his hands. Nothing. Just leaves. First time he does it, though, he looks left and right, and the evidence is that is the only time he does that.

THE COURT:   That was what time again?

MS. LOPEZ:   That was at 10:13.

THE COURT:   Is that the first time he leaves the room again?

MS. LOPEZ:   Yes, that's the first time T leaves the cabin.  He walks out and then he enters back in ten minutes later, at 10:23 p.m.  Exits again at 10:49 p.m., and then comes back into the room shortly thereafter.  And then at 10:53 p.m., he then opens the door, places the privacy sign, and goes back in.  Then at 11:21, C, the minor witness, comes into the room for a couple of minutes and then leaves and says he doesn't see his sister.

So the only person who enters and exits the room is T during that three-and-a-half time period.  No one else does.  No one else goes in.  And there is no evidence that there was someone laying in wait there for them so he could attack victim

but not somehow T.  He doesn't report it to anybody.

Then when C comes back into the room for a brief two minutes, he says I don't see my sister, I leave, and then he comes back and comes in to sleep, because when he comes back it's midnight.  And he sleeps.  When he exits that room first, he doesn't have the victim's phone.  It's about four or five minutes later when this defendant exits the room that the victim's phone is now traveling in the same path of travel as he goes to the deck to go run on deck 12.

THE COURT:  Remind me what time that was.

MS. LOPEZ:  Yes, your Honor.  He exits the room at approximately 9:26 a.m.  9:27 he is on deck 10, on his way to the deck 12 to the jogging track, and the victim's phone is already tracking the same route as him, that he's taking on the CCT, 9:27, 9:29.  9:32 he is seen smoking.  Excuse me, in the smoking area of deck 11, where the victim's phone is connecting to routers.  At 9:34 and then at 9:39, he is on deck 12 jogging, and the victim's phone, as he is walking on the jogging track, connects to that same area where CCTV captures him at about 9:46.

So the only person traveling with her phone is this defendant.  It is not C.  So I posit there is probable cause to believe C did not kill his sister, that it was T who killed her, and that he then tried to dispose of her phone.

It is clear that he had sexual relations with her and,

again, I posit that that was an assault, not consensual, because of the way the underwear is found inside of her vaginal canal.  It defeats any common sense that a person or that a woman who is having consensual sexual relations would keep her underwear on for that to penetrate along with the sexual organ of a male while she is enjoying consensual sexual relationships.  That is not commonsensical.  I don't believe that there's been any evidence to disprove that this was anything but a sexual assault, and the medical examiner has ruled so and has ruled that it happened prior to death, not afterwards.

So I do believe based on the physical evidence in this case, the router information, the amount of time in which T is by himself in the room with the victim and that during that point, at some point her health information and her texting cease, not at 12:10 in the morning, not at 3 a.m. in the morning, and because she is on FaceTime with her boyfriend, or her ex-boyfriend in the middle of the night, we know she has the capacity and has the propensity to do that, but she is not doing that because that ends before Connor ever -- excuse me -- C ever enters the room again at 11:21.  So I believe there is probable cause to believe that this defendant killed the victim.

You heard, by the way, this wasn't some sort of minor force that caused her asphyxiation.  It was enough force to

cause bruising and bleeding in her ear area, that there was extensive bruising on her left side, and it takes minutes to kill someone through asphyxiation.  It is not an accidental shooting.  We are not in that place.  And therefore, I do believe that the evidence gives this court probable cause to believe that a murder and a sexual assault happened and that T was the one who did it.

Now as to pretrial detention.  I'm going to go with -- again, I told the court on Tuesday that I'm seeking detention based on dangerousness, not on risk of flight.  The reason why I believe his dangerousness, a couple of reasons.

Number one, as I mentioned to the court, he sexually assaulted the victim in a way that is very clear, based on the evidence, that A, it was him and, B, that it was not consensual based on the way that the underwear is found and the fact that it is his semen inside of her.  This is a conscious, clear decision to have sex with her without her consent.  This isn't, again, an accident.  Someone doesn't accidentally fall into someone's vagina with their sexual organ.  He clearly made the clear, conscious decision, when we know the victim had taken a sedative already, to, with her underwear still on, enter her vaginal canal with the underwear on.  Clearly without her consent.  That is not a spur-of-the-moment act and it is not an accident.  It is a clear and conscious decision that violates the body of another person.

Then on top of that, he asphyxiates her through a chokehold.  This isn't an accidental shooting, which horrible, as it would be, is not the cause of we're playing with a gun and something accidentally goes off.  This isn't an impersonal shooting from meters or tens of feet away, as it would be, for example, in a regular gangland case where people are shooting at each other during a drug deal.  While against the law and horrible, because no one deserves to be killed by another person in that manner, it is not impersonal.

This is someone who he lived with, with whom he was raised like a sibling.  He wraps his arm around her neck and squeezed it hard enough that blood was found in and around her ear area and she has significant bruising in the left side of her face and her neck.

While she struggled to breathe for minutes, he continued to hold her neck in that manner so that she would die from lack of oxygen.  Minutes go by.  At any time T could have let that hold go.  He could have allowed the victim to breathe.  But instead, for minutes he held that position in order for her to die and kept squeezing.  That is a barbaric, intentional, thoughtful act.  Not an accident, not some sort of brief, weird moment where it sort of happens like an accidental shooting.  He made the decision to do that with, be in his arms struggling for breath, and he continues to do that until she had breath no more.

There is no indication, as the defense said, that he had any behavioral problems or problems with T, right.  He had ADHD.  Many people have ADHD.  It just causes a lack of focus.  I will posit that these two acts require focus, right.

There is no evidence of this, and this is despite the fact that he has his parent and his step-parent, who, for all intense and purposes, seem very involved in all their children's lives.  They take them all on vacation.  No warning, no hints of danger afoot, with someone who he's lived with and been raised with for at least two years as a sibling.

So we don't live in the land of speculation anymore with some defendants who come here and we posit they could be a danger based on past behavior.  He has raped someone, he has killed her already, and the fact that this happened without any warning or indication he was capable of committing these atrocious acts, how can this court be assured that he will not do them again without warning and without any indication with other people who may be around him at the time.  The court doesn't have that assurance, and that is what makes this so dangerous.  Without any warning, without any hint, without any prior indication, this defendant raped and killed his stepsister while on vacation.

The court has no assurance to the court that he won't at some other random moment do it again.  He had lived with the victim for two years.  Nothing had happened until then.  Maybe

he tried to crawl into the bed, if you believe the boyfriend, and I think that is for another court another day, although the court surely can take that into consideration, but even if you were to take that into consideration, that makes it even worse. There is no indication at any time that there were any issues for two years and, all of the sudden, he rapes her and he kills her. That is dangerous and the court cannot be assured that he will remain without hurting himself or others in the future.

On top of that, your Honor, we have a situation in which, as the court heard, this defendant has stayed with his uncle, his mother's brother, on the other side of the state since they got back or since he was released from the cruise ship to go back with his family. While this hasn't been made yet, I will let the court know, I fully will reject any argument by the defense that these two months he clearly showed the government wasn't concerned. The government was doing its investigation to make sure this was an intentional act and that he committed it.

The time frame in which all those pieces of evidence came back, I think it would have been inappropriate for the government to arrest him via complaint, especially because he is a juvenile, simply on the, well, maybe it happened. I think the fact that it took two months, almost three months for this to happen, and in coordination with his prior defense attorney because we decided to allow him to surrender and not to arrest

him and traumatize him further, should not be held against the government.  I believe that is actually being responsible.

That having been said, I have become aware of a couple of things in regards to his current situation.

Number one, the uncle has two minor children who live in the house.  So that is a problem, when we know that at a moment's notice, without any warning, this defendant will attack people and do so in the worst possible ways that can be humanly imaginable.

His father, who lives near the uncle, has two stepchildren who live with him.  So again, no matter where he stays in that area he is going to have minor stepchildren or, excuse me, children near him, and that, again, based on the facts of this case is concerning to the government in terms of his ability to harm them.

THE COURT:  What are the ages and genders of the children who live in the house?

MS. LOPEZ:  I'm unaware as to the stepchildren.  I'm sure the defense can provide more as to that.

My understanding from the mother is that one of the, I guess, children, that are her niece or nephew -- she didn't provide genders -- one is about 10 and I think the other one is about 7 years of age, if I recall correctly, but the defense can correct me if they want to as to that point or as to the stepchildren.  I don't know the ages of these stepchildren

other than they are less than 18 years of age.

Again, this defendant was able to rape and kill an 18 year old.  So I'm not sure if the age really matters.

T.H., a decision was made to have him homeschooled after this happened, but the mother has received little-to-no information from the uncle as to the progress or completion of any of the school work that T.H. is supposed to be doing.  That is of concern because clearly there is no communication, it seems, right now between the mother, who has 80 percent custody per the custody agreement, and her brother.  So that is a problem.

The third problem is that the current custody arrangement, as ordered by a state court judge in Brevard County, is that the defendant's mother, T's mother, has 80 percent custody and the father has 20 percent custody.  He has filed litigation, motions, to ask the court to change that custody agreement.

The emergency motion for him to take custody of his full daughter, who also is in the custody of her mother, was denied by the court.  But an amendment to the general custody agreement is still ongoing and that litigation is pending.

My understanding is that the father is allowed to pick up T whenever he wants to and to be with him whenever he wants to in Brevard or, excuse me, in the Brooksville area without consulting or speaking to the mother, which is in direct

violation of the current custody order that is in place.

Regardless of whether or not the father's contesting that, and maybe the uncle supports him in contesting the current custody agreement, the fact is that there is a court order that says that the mother has 80 percent, the father has 20 percent, and any changes in that have to be told to her as the legal and physical custodian of her son.

So it shows me that there is already a willingness, perhaps, or an inclination to not follow court orders when given, which is a concern to the government, not only because they're not telling when T is leaving with his father outside of the custody agreement or, excuse me, the custody order, but also that the mother at this point has no idea what is going on with his schooling despite the fact that as his legal parent and guardian she is entitled to that information.

So I bring that to the court's attention because I am a little bit concerned about that and whether or not that reflects on the ability --

THE COURT: But how would detaining him at a juvenile facility help that matter?

MS. LOPEZ: Well, first of all, it would make sure this defendant isn't violating any other court orders by galavanting about, with whoever it is, despite a state court's orders that he is to remain in a particular location. By being in custody, it makes sure that he is where he is supposed to be

and not violating any court orders, including this court's.

By also not staying with the dad or the uncle, he's not going to be anywhere around other children who he could potentially hurt.  As I mentioned before, this act came without warning and without any indication that it could happen.  So this would assure the court that he is in a controlled environment where he will have very little chance of hurting others.

The second thing is that if he is -- and I think I mentioned this on Tuesday, but if I didn't, I'll say now.  The government has already spoken to the marshals.  The Marshals Service has already made arrangements with the Department of Juvenile Justice to house this defendant, according to the parameters set forth in Title 18, 5035.  That means that they will be housing him in a juvenile facility while this case remains in juvenile status.  He will not be housed at the Turner Guilford Knight Center in the juvenile section because that is for juveniles who are already charged as adults, whose cases are in adult status.

The order that your Honor signed with the information makes it very clear that he is to be processed at the Juvenile Assessment Center here on Third, which is where the juveniles go to get processed when they are arrested in state court, and that he will be housed in the Juvenile Residential Center, ensuring that he has not only the usual heat, air conditioning,

food, water, and enough recreation time, but that he is schooled, and schooled appropriately, to ensure that he is getting his education even if he is detained, something that this court has no assurance of right now and neither does his mother.

Does the court have any further questions for the government?

THE COURT:  Just so I understand, in other words, on the custody issue, which is not before the court, but on the question of the concerns that the government expressed, the mother is supposed to have 80 percent custody and the father is supposed to have 20 percent custody, but it is the uncle who is housing him?

MS. LOPEZ:  Yes.  The mother --

THE COURT:  Was that approved by the state court?

MS. LOPEZ:  My understanding is that the mother, as the primary physical custodian and legal custodian of T, was allowed to place him in the custody of another person on her behalf.  That has been brought before, my understanding, to the state court judge in Brevard and she has allowed T to remain there because the mother has stated, when this emergency motion for custody proceeding began, which the father initiated, she stated it was her preference for her to be there.

I think one of the reasons for that, that was stated in court, was because it is a little, I guess it wouldn't be

beyond the realm of imagination to say this case has received a lot of media attention.  Everyone is aware, unfortunately, despite our best efforts to keep things quiet and concealed during the investigation process, that he is a possible suspect, and she felt it was safer for him to stay with the uncle than to stay in the town where the victim was from with the family, etc.

So I say that --

THE COURT:  The uncle is the mother's brother?

MS. LOPEZ:  Brother, that is correct, your Honor.

THE COURT:  OK.

MS. LOPEZ:  My understanding is when it was brought to the court's attention, the state court judge decided that T would remain in the custody of his uncle, that the younger sister would remain in the custody of the mother, and then decided that that emergency motion, having been denied, that if the father wanted to contest the general custody order that he could do so, which is the litigation that is pending right now.

I know that they have taken testimony in state court, which I haven't been able to get a copy of because state family court proceedings, generally speaking, the docket remains generally not private.  I've tried to get in touch with the family law attorney to get any more information, but there have been journalists present in that courtroom because the courtroom is not sealed, it is still opened, who have reported

extensively about the fact that the emergency motion to take custody of T and the sister was denied, but the current proceedings challenging the general custody order and requesting an amendment is ongoing.

THE COURT:  OK.

Turning to the defense.

MR. KUHL:  Thank you, your Honor.  I know we have been going for a while so I will try to be brief.

I want to address three main points.

First, I want to talk about the probable cause.  After that, as I indicated earlier, I just want to respond to something the government said about the operation of the JDA here.  And then finally, I want to talk about the conditions of the bond package we are going to propose.

So first, I don't think I fully anticipated your question when you asked about why you needed to make a probable cause hearing.  So I just want to be clear about -- probable cause finding -- I want to be clear about why I think it is appropriate here.

I am not arguing that the JDA requires you to make a probable cause finding at this juncture.  I think it is appropriate because of the Fourth Amendment and the Fifth Amendment's due process clause.

Obviously, the Bill of Rights outlines a lot of criminal protections, but the Fourth Amendment, although

frequently relevant to criminal prosecutions, is independent of that, as is the due process clause.  So if we're going to detain this individual, if we're going to seize him, I think there needs to be a showing of probable cause beforehand and he needs to have some semblance of procedural due process before that happens.  So that is why I ask that you make the probable cause finding.

With respect to making that probable cause finding, we've been here for a while.  You heard the government's proffer.  You heard Mr. Cohen's questions.  I will largely rest on that.  I think it is clear that there are a lot of gaps and question marks about this investigation, gaps and question marks that the government is filling with guesses and assumptions.

THE COURT:  On that point, I guess, the question, to just cut to the chase about it, is given the circumstantial evidence, right, of the comings and goings of the people in and out of the room, coupled with the evidence of sexual contact between your client and the victim and coupled with the victim's phone, how it traveled during the period of time when the victim was not with the phone, which, again, is subject to challenge, but this is a *prima facie* basis --

MR. KUHL:  Right.

THE COURT:  -- why wouldn't those three things put together amount to probable cause that an inference, a

reasonable inference can be drawn that your client, A, assaulted her and having assaulted her or in the course of assaulting her asphyxiated her?

MR. KUHL:  Well, on the point of the sexual assault, I mean, look, there's DNA evidence.  They have strong evidence to support.  Obviously, we are going to reserve the right to challenge that.  But assuming for today, I mean, it's probative, right.  I think they maybe have satisfied their probable cause burden of showing that intercourse took place. I don't think they've satisfied the burden of showing that was nonconsensual.

They make hay of the fact that her underwear was found inside of her vagina, although given the fact pattern before the court, the record that you're dealing with, there's a universe in which it was not the intercourse that caused the presence of the semen that also caused the positioning of the underwear.  More specifically, they are assuming that A engaged in sexual intercourse only once that night.  That is what I mean by it's being based on guesses and assumptions.

So I don't think they make a showing of probable cause for the sexual battery and I don't think they make a showing of probable cause for the murder because, as we -- excuse me, you heard on direct, right, there is a large window of opportunity where this could have happened and there is more than one person in the room.

So I don't think they've proven probable cause.

With respect to the phone, I don't know.  I don't know why he would have the phone.  I don't know why it went into the trash can.  I don't know.  It is unclear.  It is curious.  Like I said, there's lots of gaps and question marks that surround this.  I would be speculating for your Honor.  But I mean, obviously, there are plenty of reasonable doubts about what happened here, and I would submit it doesn't rise to the level of probable cause either.  Ultimately the court is going to make a finding.

Moving on to my second point about the JDA.

Counsel for the government seems to think this is a criminal prosecution, and I'm sure she will correct me if I'm wrong, but it simply is not a criminal prosecution.  The Bill of Rights lays out a number of constitutional rights that protect criminal defendants.  The Fifth Amendment requires an indictment.  The Sixth Amendment requires the appointment of counsel and a public trial.

It is no secret --

THE COURT:  Rather than going back to the prosecutor, isn't it fair to say that, at least in a juvenile proceeding under the statute, it is a quasi-criminal proceeding?

MR. KUHL:  Yes.

THE COURT:  Meaning that the procedures are different.

MR. KUHL:  That's fair.  The procedures are different.

But we are not finding people guilty of crimes.  We are adjudging individuals delinquent of the laws of the United States.

THE COURT:  Right.

MR. KUHL:  The reason that verbiage is different is because if we called them crimes and we called it guilty, then they'd need to have all of these protections.  But we recognize the unique position that juveniles are in.  We recognize the vulnerability of children, that they are not fully developed and that they don't have control necessarily over the environments that they're in.

So Congress has struck a bargain, right.  They set an upper limit for punishment at 21, and they also appreciate important privacy concerns, which is why for the most part today we've been addressing everyone by their initials.  It is why he is charged in an information that addresses him with his initials.  It is why the courtroom is sealed.  We respect that children need special treatment and shouldn't necessarily be held in custody for the rest of their lives because of something they do when they're kids and they're not fully formed.

Obviously, the government intends to move this to adult status, right, and at that point his right to indictment is going to kick in, his right to everything else in the Constitution is going to be in full force.  But right now as it

stands, Congress has chosen a bargain, and the bargain here requires your Honor to look at this bond package under Section 5034 of Title 18 of the United States Code.

So now that I think we've kind of got a record on that point, I will move on to the bond package.

THE COURT:  My understanding is there is no bond per se, but there are obviously conditions of confinement or conditions of release, I suppose.

MR. KUHL:  Yes.  I mean, look, I think it would be in the discretion of the court, and we're asking for this, right.  You could release him ROR today in the custody of a parent.  The statute allows you to do that with nothing more than the parent or guardian or responsible individual's promise to bring him back as required to do so.

There is a carveout that you could detain them if he is a danger to himself or others, and I'm not sure whether the government is submitting that he is a danger to others and himself.  I hear them just saying he is a danger to others.

THE COURT:  Right.  They mentioned, in fact, other siblings or half-siblings.

MR. KUHL:  Right.  I am going to get there.

You have to make a finding that I think there is no condition or combination of conditions you could put on his liberty to ensure the safety of the community, right, and that is why we would think a personal surety bond is appropriate

here with conditions that can alleviate the court's concerns that he is a danger, because if you release him with these conditions, you can't make the finding that he is a danger to others.

So this is the bond package.  Before I get into that, I mean, I want to be clear about something.

We're not arguing that the government wasn't interested in detaining him, right.  I respect the government's position that they were investigating and they were allowing a special situation to kind of unfold while he stayed out.  I appreciate that.  I'm not saying that you need to look at the prosecution and say, well, you agreed to let him stay out, right.  That is not what I'm arguing.

I'm arguing, first and foremost, that he is a child. I mean, look at him.  He is 120 pounds soaking wet.  He's a kid.  By all accounts, from what I have been able find, he is an honor roll student.  He is good at school.  Obviously education at this point, the past three months of his life, I understand he's been given schoolwork, but he's not enrolled in the school that he was previously going to and what is happening in his life is obviously very traumatic for everyone involved.  It's a tragedy for every person in this room.  But he has no disciplinary history.

The allegations in this case are a unique blip on an otherwise unblemished record, right.  He's never been in

trouble before.  And for the past three months that he's been out and in the custody of his uncle, which he is in the custody of his uncle with the consent of his uncle's sister, his mother, there's no indication that he's hurt anyone during this investigation.  Instead, he's cooperated with the FBI.  Obviously, they got a search warrant for his phone, but they also got his DNA.  Did he fight them when they came for his DNA?  No.  He consented to a collection of it.  He peacefully met with the FBI.  They swabbed his cheek.  No issue, no harm.

I think when they do these detention hearings in front of your Honor, frequently under the Bail Reform Act we don't have the benefit of what we have here; essentially, a beta test.  You let him out on Tuesday and he's here.  He showed up.  He hasn't hurt a fly, right.  So we know that he can be released on nothing more than a promise to return and he won't hurt anyone.

So I think the past three months, and specifically the past week, show that there are conditions you can place on this child to ensure that he is not going to hurt anybody.

Specifics.  Probation recommends a personal surety bond despite the severity of this charge, right.  They suggest that he be released on a personal surety bond with family cosigners.  I've got that.  His father and his uncle Devon, who he is currently living with, will cosign on the bond.  They say he can't have a passport -- he doesn't have a passport -- and

he doesn't has a driver's license.

They submit they want him to sit for a mental health assessment and treatment, if necessary.  No problem with that.

No guns in the home is their recommendation.  Straight up with you, he is a responsible gun owner.  He keeps his firearms in a safe.  He has no problem whatsoever surrendering those firearms to a third party if your Honor does not want any weapons to be in the home.

Probation wants travel limited to the Southern District of Florida and the Middle District of Florida.  Again, completely fine with us, and we're willing to go further.  If your Honor wants to impose the condition of location monitoring, whether that is a curfew or home detention or anything, we're open to it, right.  He'll wear an ankle monitor.  I don't think it is necessary, but that is something we can do.

Moreover, I am going to add this because this is a rare thing we get on bond packages, but Mr. Ziske is willing to serve as a third-party custodian for him.  He's essentially already been that already, but I want to tell you a little bit more about Mr. Ziske and I want to invite the court to colloquy him if they'd like.

The government brought this up.  His parent, his wife Sara, is a stay-at-home mom.  She homeschools both of their children.  He has a son that is 10 years old and a daughter who

is 7 years old.

I specifically asked this man, have you at any point had any concerns about the safety of your children with Tim in the home.  He has no concerns.  No concerns whatsoever.  He did not blink an eye when he was asked to take custody of this child by his sister.  He did it because he loves his family and he trusts this child.

I think it is also important to talk about who Devon Ziske is as a human being because he is uniquely equipped to step in, in this situation.

Devon Ziske is a veteran of the United States Army.  He started in the Airborne infantry.  After that he got involved with the chaplain's department and specialized in crisis management.  And after that, I believe it was after that, he actually started working and recruiting around Hernando County.  So he works with children and encourages them to join the armed services.  He is a religious man.

He specifically asked me that if Tim was released -- excuse me -- T was released that he be permitted, at a minimum, to attend church services twice a week with the family.  He is no longer in the military.  He now, essentially, is in the real estate business.  So he buys homes and then either flips them at a profit or he rents them out to tenants.

I understand that in addition to his homestead, where he and his wife and his children and currently Tim lives, he

owns five other properties.  Two of them have tenants in it, two of them are under construction, and I think one is being prepared for sale.  I think that is relevant for the court because when we show up on personal surety bond, it is important for the court to know there are assets to back up that promise.

THE COURT:  The real danger, the real issue is on the risk to others.

MR. KUHL:  I know.

THE COURT:  And on that issue, how old are the children in the family?  In the household, rather.

MR. KUHL:  10 and 7.

THE COURT:  And genders?

MR. KUHL:  The boy is 10; the girl is 7.

THE COURT:  OK.

MR. KUHL:  Look, I mean, this is the *status quo* that has been working.  We are proposing making a more secure *status quo*, not a weaker *status quo*.

I want to contrast that with the alternative, which is this idea that he is at a juvenile detention center.  Yes, in the beginning he is going to be at this juvenile secure detention center, but it is my understanding that if they are successful in their attempt to transfer this to adult status, he will be moved to TGK or Metro West.  This is relevant because he is not a big guy and --

THE COURT:  On that point, though, taking your point, if, in fact, he is transferred to adult status, potentially then the government's case for detention would be stronger, wouldn't it?

MR. KUHL:  I do think that we may have to have another bond hearing, but I mean, I think at that point the appropriate way to operate would be, if he were released on a bond, would be to come back and do the initial appearance and arraignment in front of your Honor and have a discussion about whether we need to modify or revoke the bond.  I think we've spent a lot of time, you've heard the evidence, and we'd at least at that point have a sample size of information regarding his compliance and could make a determination going forward.

Prior to moving across the state with his mother and his new stepfather in 2024, he did really well in school.  He went to a small Christian school, and he was bullied, and that was a big problem for him.  He was bullied quite harshly as he was growing up.

I haven't worked as a juvenile attorney in the state.  I don't have that experience.  When I was in law school, I and others taught at AO at Kids, which is the a Department of Juvenile Justice program.  So I know the type of kids that are being housed at these things.

I am just concerned they are going to eat this kid alive, and I don't see how it makes him safer or anyone safer

to put him in that environment when we have what is a very unique but acceptable situation, where you have someone who is so uniquely equipped, and, again, it is Devon Ziske, right. This man is the perfect person to help the system.

THE COURT:  Now what about the concern expressed by the government in terms of the status of the custody arrangements --

MR. KUHL:  Sure.

THE COURT:  -- or debates or proceedings that are going on in connection outside the scope of this case, but in the family court case?

MR. KUHL:  So here's my understanding of the lay of the land.  There is a custody, like a parenting plan in their family law case where mom has 80-percent custody of the children and 20 percent -- and dad has 20 percent.  I understand with the oldest son it is different because the oldest son lives with dad, but T and his younger sister are 80-percent custody with the mother.

When this happened, T's mom and stepfather made it abundantly clear that he was no longer welcome in their home. He was essentially abandoned.  She is not going to give dad custody of him, but she was willing to give Devon custody.  So Devon stepped in, no questions asked, and took over, and she has consented to that in writing, and I understand from the government that the family court is allowing this to happen.

THE COURT:  Right.  I would imagine that this is something that the court had to have approved or been aware of.

MR. KUHL:  Yes.  Look, I mean, like we don't want him to see the dad, we don't want him to violate the court order in the family court.  I mean, there is no indication that he is galavanting around.  Honestly, my understanding of what he has been doing most of the time is he is either at Devon's home or he is going to the properties that Devon is fixing up and he is teaching him how to fix up homes and he is just having him help out as they build a deck, which is good because he, one of his favorite things is being outdoors and experiencing nature, which he is not going to get to do in secure detention.

THE COURT:  What about that, going back to the government in terms of actually one of the concerns, that the consideration that the court has to make under the statute is danger to the defendant in detention.

MS. LOPEZ:  Yes, your Honor.  First of all, I do want to correct one small thing, and that is that as to Section 5034, I disagree with Mr. Kuhl that at any point this court can release the defendant without any sort of conditions.

The last paragraph in 1634 -- excuse me, 5034, states: If the juvenile has not been discharged before his initial appearance before the magistrate judge, the magistrate judge shall release the defendant, the juvenile to his parents, guardian, or custodian or other responsible party, continuing

on upon their promise to bring such a juvenile before the appropriate court, requested by such court, unless --

THE COURT:  Where are you reading from?

MS. LOPEZ:  This is the last paragraph of 5034, your Honor, the duties of the magistrate in the JDA.

THE COURT:  OK.

MS. LOPEZ:  It says that the court shall do this unless the magistrate judge determines, after hearing, which is the hearing at which the juvenile's represented by counsel, that the detention of such juvenile is required to secure either his timely appearance before the appropriate court or to ensure his safety of that or others.

So it does provide the mechanism and allows this court to detain him now that we've had this hearing.

To go to your Honor's -- I bring that up not only because I disagree with Mr. Kuhl on that point, but also because it then segues into 5035.

Unlike other defendants, right, the Bail Reform Act does not have an exhaustive list of all these rights that defendants have who are detained under the Bail Reform Act. Now, some are inherent into the Eighth Amendment.  Some have been litigated subsequently involving the Eighth Amendment in our courts and, indeed, the Supreme Court, which has delineated that.  But 5035 protects the juvenile by saying he may only be detained in a juvenile facility and that it is, that every

juvenile in custody shall be provided with adequate food, heat, light, sanitary facilities, bedding, clothing, recreation, education, and medical care, including psychiatric, psychological, or other care and treatment.

So the JDA says that while this defendant is in juvenile custody, he shall be provided with all of those things in an adequate amount, and it specifically states recreation and it states light.

Why do I bring that up?  First of all, the reason why the JRC or the Juvenile Residential Center exists separate from the area in TGK, which I will get to in a second, is because the Florida state legislature has recognized that juveniles who are detained because they are considered to be either a danger or a flight risk are supposed to have more rights than adults because they're young.  So it also provides sufficient recreation time for them, it provides education, which the pretrial detention center in Metro West and TGK adult facilities provide them but do not require them.  He is to have an education while he is in, adequate medical care, food, etc.

One of the reasons why I spoke to the marshals before this defendant even surrendered himself was to ensure, and the marshals have toured the facility and they have told me that they are satisfied that the JRC, which is the Juvenile Residential Center -- I'm just talking about it as the JRC -- provides the sufficient rights and items that he is entitled to

under 18, U.S.C., 5035.

So I believe that even in detention he will be provided with those opportunities, understanding he is not going to be able to go build a deck, but he doesn't have a constitutional right to build a deck.  He has the right under the JDA to have his recreation and light time and to have all those things that he has under that section.

So the marshals have toured the facility.  They are satisfied that it meets the requirements of that.  Based on my past experience, though I did not personally practice in the juvenile division at the State Attorney's Office, I have friends who have, and I spoke to one of the attorneys who currently works there and they assured me that all those things will be present and that if any time counsel feels that that is not being complied with or I feel it is not being complied with or the marshals feel that there may be something that is not being complied with outside of, let's say, bad behavior by this defendant while incarcerated, I'm happy to come back before this court or any other court to ask that the court ensure that the DJJ keep that.

THE COURT:  How do I deal with this language of the statute:  Whenever possible, detention shall be in a foster home or community-based facility located in or near his home community?  How do I deal with that?

MS. LOPEZ:  Well, it clearly says whenever possible.

However, I haven't heard that be a part of what the defense has requested, and I'm asking for --

THE COURT:  Why wouldn't the uncle kind of satisfy that?

MS. LOPEZ:  He is not a foster home because he is not in foster care, and that specifically, I think --

THE COURT:  Yes, but the whole point of foster care is that there be some -- the theory being there be some responsible place that puts somebody out of the environment that may have generated criminal behavior.  That is what a foster home would do in that situation.

Here, why isn't he the functional equivalent of a foster home?

MS. LOPEZ:  I believe that foster home means you do not have responsible adults that the court has decided that are related to and who have custody of you who could take care of that.  That having been said, if the court wants to take it to the most, I guess, broad application, it could be.  I go back to the fact that this goes to, I believe that this defendant is such a danger that even that situation is not tenable and enough to ensure this court that he will not be a danger to others.

As I mentioned before, there are minor children in the home and I appreciate -- look, I am not faulting Mr. Ziske for wanting to take his nephew.  I understand that completely.  And

I understand that because he loves his nephew he may not be concerned.  But the parents weren't concerned when he lived in their home.  In fact, the parents were so unconcerned that he was a danger that they had him in the same room as C and the victim, and yet look what he did.

So, again, I don't think his lack of concern is enough to ensure this court that this defendant will not be a danger to others, and I do believe that the situation or the detention at the Juvenile Residential Center is sufficient to ensure this court, and in fact might be the only way to ensure this court, that he is not a danger to others while also making sure that he receives all of those things in 5035 that he is entitled to.

THE COURT:  Now if I grant your motion, why would I then, given the language of the statute, house him here as opposed to somewhere up in the Middle District?

MS. LOPEZ:  Well, your Honor, first of all, because --

THE COURT:  He has no family here, right?

MS. LOPEZ:  His mother lives and other family members live nearby.  I think the one issue is that --

THE COURT:  They live in Miami?  I didn't know that.

MS. LOPEZ:  I'm sorry.  They live nearby.  That means Titusville, which is about two hours away.  That is where the rest of the family live.  His uncle and his father live near Brooksville, which is on the other side of the state, just to be clear.

THE COURT:  OK.

MS. LOPEZ:  They are on different sides of the state.

THE COURT:  But Titusville will also be in the Middle District.

MS. LOPEZ:  Yes, it will also be in the Middle District, but closer to this district.

THE COURT:  How can I house him here?

MS. LOPEZ:  Well, your Honor, because he's charged here.

THE COURT:  How do you deal with this language: Detention shall be based in a facility located in or near his home community?

MS. LOPEZ:  Well, it says that the juvenile alleged to be a delinquent may be detained only in a juvenile facility or other such place as the Attorney General may designate.

THE COURT:  Right.

MS. LOPEZ:  Whenever possible, detention shall be in a foster or community-based facility.

That is the instruction to the Attorney General, not to the court.  It is instructing the Attorney General that he may only be detained in a juvenile facility or other suitable place and whenever possible, detention shall be in a foster home or community-based facility.  That is the instruction to the Attorney General once this court has made the decision that he should be detained prior to trial because he is a danger to

himself.  So really, that is in the sole discretion of the Attorney General/the BOP or the Marshal Service.

I have --

THE COURT:  Putting the procedure aside, why would we house him somewhere where he is not near his family?

MS. LOPEZ:  Your Honor, my --

THE COURT:  In other words, he has no family here.

MS. LOPEZ:  The Marshal Service has a relationship with the attorney -- excuse me, with the Department of Juvenile Justice here, along with the Miami-Dade correctional facility and --

THE COURT:  But they weren't looking at this language. In other words, this is the first time I have focused on this.

MS. LOPEZ:  Here's the problem, your Honor --

THE COURT:  Right.

MS. LOPEZ:  -- is that in order to ensure, and this I discussed with Ms. Becker, Mr. Cohen earlier this morning.

In order to ensure that there aren't any clerical mixups while he is in custody at the JRC and in the custody of the DJJ while this is in juvenile status, the order that your Honor signed specifically stated that the marshals are the only ones who can transport him or must be present when they transport him.

When there are hearings on this case, if he were to be detained across the state at a facility, the marshals have the

responsibility to go pick him up and bring him back, which is a significant time frame or efforts or resources to bring him back for every single court hearing.

So the best way of ensuring that he is able to come to his court hearings, without having to be woken up at 2 a.m. to be brought over here, to make sure that he is making it here on time, if there are any issues, for example, with a hearing going overtime or whatever, he is nearby so that the marshals may transport him back and forth.

There is nothing in 5035 that prohibits him from being incarcerated someplace that is not near his house; it just says there is a preference, and that preference is directed to the Attorney General.

THE COURT:  It says whenever possible.  It says whenever possible.

MS. LOPEZ:  Correct, but it doesn't say that it is only or the Attorney General shall, and that is why I bring that up that it's possible, but he is being charged in a place that is not his home district.  Therefore, the possibility of housing him across the state and still being able to transport him back and forth I think is, regardless of whether he is in a juvenile facility in whatever county Brooksville is in -- and I will apologize for my ignorance of that; I know it is north of Hillsborough -- or whether he is in the uncle's home, it would still be the responsibility, if the court is going to find that

he should be detained and find that his uncle's home is a foster home, under the way that this works it is still on the Attorney General to make sure, and the Marshal Service to make sure, he comes back and forth.

So I don't think that -- under that language, I think that Congress was wise enough to acknowledge that it may not always be possible for different reasons, and I argue that this is one of those reasons.  He wasn't charged in the Middle District because the crime, the boat came here and the court is here and in order to make sure that he is, if, as I argue, the court should hold him in detention because he is a danger to others, it is not that possible or that practical to have him housed on the other side of the state and have the marshals take him back and forth within hours, because otherwise, here's the option.

Let's say the court will say, well, that's fine, I think that we could possibly have him here and still over there on the state and make sure he is there on time so we will just bring him a little bit earlier than usual or we will schedule things in the afternoon.  Well, something goes over.  What happens if he has to be held here?  What happens during any other hearings where it is not practicable or possible to take him across the state for whatever the reasons the marshals have.

We still have to have a facility here to house him

where he will be in custody but without the presence of adults and making sure that he has all of these special rights that juveniles have under 5035 during their course of incarceration. Therefore, I, again, don't think that that is practicable or possible.

I think what is practicable or possible given the danger he poses and given the fact that the statute already acknowledges that it is not mandatory but whenever possible, and I don't think it is that possible or practical here, is that we have gone out of our way to make sure that DJJ has an appropriate place for him to stay here.  It is still near his mother and other family members who live in Titusville.  He is not precluded from the uncle visiting him.  The juvenile facility has the same rights as other facilities for family to be there, and they also have phone and video capabilities to conduct calls with family members, etc.  So I do think it is sufficient, and the statute does not require that it be near the home.

THE COURT:  You don't think that it is a factor I have to consider in whether or not to detain, the fact that he is not going to be anywhere near anybody that is a part of his family?

MS. LOPEZ:  No, your Honor, because the duties of the magistrate are, in 5034, and it says that this court should determine whether or not he should be detained because he will

not be able to appear here as required or to ensure his safety or that of others.  5035 is it.  Instructions to the Attorney General.

THE COURT:  What if I find that detention actually presents a danger to himself, to him, actually in part, because he is so far away from his family?  What about that?

MS. LOPEZ:  I would disagree with that, your Honor. There has been no evidence presented here today that this defendant suffers from any sort of mental defect or anything else.

THE COURT:  He clearly suffers from some mental defect if the government's case is accurate, right?

MS. LOPEZ:  But to finish my thought, he doesn't suffer from some mental defect or sickness that would pose a danger to him if he was not around his family in the immediate area.  There's been no evidence of that.  In fact, the evidence is that even with them around he's committed these dangers.

So I don't think that the court can make that jump because we have heard no evidence of that, and, in fact, the evidence proves the opposite, that even with family support around him and with people that he knows around him, in a very stable environment where they're on vacation having fun, he still commits these atrocious crimes.  So I don't think that is going to do anything.

THE COURT:  The point that you just made actually

raises another point, which is, I would imagine, that one of the things, and I've tried to find authority on when somebody decided to detain a juvenile and I haven't found any really, for whatever reason, A, it could may not be a common thing or, B, it is done summarily and without an opinion and so, therefore, there is nothing published about it.

It would seem to me that given the language of the statute, one of the concerns about having a juvenile outside of detention is if the person has had a history and that history shows that no matter what somebody has done to try to help that person within the juvenile system the person continuously commits crime, and so therefore at some point it becomes a detainable case.

Don't you think that that would be a more relevant factor and if so, how does that fit here given that we don't have any prior history of any juvenile offenses?  And you said crimes.  Well, technically it is one event.  Two crimes and one event.  So how does that cut?

MS. LOPEZ:  So to address the first issue, again, as the court says, we are kind of all flying blind here because there really is, again, as the court says, we don't know if it's just never been contested, if there just hasn't been an opinion.  We really don't know.  But there is a dearth of any decisions on this particular issue.  So we are all flying blind here, and I think we all acknowledge that that makes this ten

times more difficult.

That having been said, because we as lawyers like to have very definitive guidelines and parameters and we just don't have it, I think that the first thing is that we -- I'm sorry.  My boss is calling me.  It took off my train of thought.  I am supposed to have a meeting in my office right now.

THE COURT:  I was asking about, isn't detention in the juvenile setting better for a repeat offender than, and even though this crime was particularly heinous -- obviously the most heinous, in fact -- we don't have a repeat offender, we don't have a history that I can rely upon.

MS. LOPEZ:  Yes.  So first of all, the JDA does not say that this court should only detain this person or any juvenile upon a repeat offense.  I think, just like the Bail Reform Act, if we were dealing with an adult, the court can still detain someone based on the nature of the offense of the crime committed and the evidence as to dangerousness or risk of flight, if that is what we were discussing, that they should be detained despite not having priors.

I don't think priors change here, especially because the statute, 5034, does not prescribe that.  The only time priors appear or prior acts of delinquency appear in the JDA is in discussing sentences or disposition, which, of course, we're not there, but also discussing whether or not this becomes an

automatic adult transfer.  That is the only time it appears.

If this defendant had a prior crime of violence, then it would indicate it would be an automatic adult transfer, but that doesn't mean that the court cannot detain him even if it is an automatic adult transfer.  Nothing in 5034 discusses that, and I think that if Congress, given the other things that they included, including the ability to release him on a promise prior to this hearing, which I, again, indicated to the court I needed to follow despite the fact that that would not be my preference -- that is not my choice -- Congress already made that for us, and that was pretty clear.

I think if they felt this court should only take into account or only consider for detention people with priors, they would have said that.  They didn't do that.  They only said that this court could detain if they find it is a risk of flight or a danger to self or others.

To go to the second part of the court's question, therefore, I feel that the fact that we have a single event without warning, without any indication that he was even close to doing this, and he committed not just one horrific crime, probably the worst you could commit against someone, but a second one that violates a person's body, is concerning and really cuts towards he really is a danger who at any moment, to quote the case, could pop off, as they say, and commit a crime like that without any warning, that is very dangerous.

The court has no assurance that unless he is in a controlled environment, such as detention in a facility where he has structure, still we're giving all of the things that he is entitled to under 5035 but isn't around people who, or at least in an environment that is controlled enough that it stops people from hurting one another that he is not going to hurt someone.

THE COURT:  Other than other individuals who are also at the facility.

MS. LOPEZ:  That is only something that occurs at a facility.

THE COURT:  There are also children at that facility.

MS. LOPEZ:  They are all children at that facility.

THE COURT:  And they are not housed in cells because of the facility.  It is an open facility.

MS. LOPEZ:  However, again, that's always a possibility, but then he'd be dealing with people his own size and his own age, not a 10 year old, not a 7 year old, and, number two, again, that is going to be up to this defendant, and, again, if something is happening that is outside of his control, it is not because he did anything, let's say.

I'm just going to throw this out there to the court. Maybe recalling about 15 years ago, there was a case where Department of Juvenile Justice officers were basically egging juveniles on to beat up other juveniles.  That's been dealt

with.  Those people went to jail, and there have been no further complaints of that either to the county or to the state.

THE COURT:  I have not heard of that.

MS. LOPEZ:  OK.  In all candor, that was a criminal case.

THE COURT:  I'm just assuming that it was other juveniles, not the juvenile correction officers.

MS. LOPEZ:  Well, they were egging other juveniles to beat up other juveniles, if that makes sense.  So they were egging on juvenile detainees to beat up other juvenile detainees for their entertainment, for lack of a better phrase.

That case was charged by the State Attorney's Office over 15 years ago.  They prosecuted that.  Those people were found guilty.  Those were the only people who were involved in that.  There's been no subsequent.  The Department of Juvenile Justice --

THE COURT:  What facility was that?

MS. LOPEZ:  That was at the Juvenile Assessment Center here in downtown, where he would not be housed.

DJJ has since changed how they house juveniles.  Back in those times they would be housed at the Juvenile Assessment Center for a good period of time unless they were released on bond.  So now we have the Juvenile Residential Center where people who have already been processed but are detained stay.

That having been said, DJJ changed its vetting procedures for those officers since that period, which, again, was over 15 years ago.  I can supplement the record with the date, but I don't remember the date at this point.  I know it was early in my career at the State Attorney's Office, and I started there in 2006.  So I just told my age, but neither here nor there.  There have been no subsequent complaints or whistleblower complaints about that occurring or there being any malfeasance or issues at the JRC or the JAC since that case.

So the only reason why I bring it up is, I know, and maybe it was something that the court had in mind, maybe not, but the point is that even if you were to take something like that, which I think would be the most extreme and egregious example, that hasn't happened since, then there have been no complaints of that, which is why I think the Marshal Service, upon their review of the facility, has found that it satisfies them, that it meets the requirements of 5035.

This defendant will be safe there.  But like any inmate, if he has any problems, I have no issues, like any other inmate that I've also dealt with on many of my adult cases, for the defense to bring to my attention he's having these issues, we bring it before the court and we discuss it with the court at that time in order to assure some other way in which we can avoid issues if they exist.

That having been said, I do want to go to something very small that Mr. Kuhl mentioned, and that is that if this case were to go to adult status, he would be going to Metro West or TGK.

He would be going to TGK, and he would be going to TGK to the section that houses juveniles charged as adults.  There are no adults in that section besides the correctional officers.  It is a separate area of TGK.  In fact, it is the area of TGK that used to be where women were solely housed.

My understanding is that it is been repurposed for juveniles.  So women are still housed at TGK in other areas, but the point that I'm making is that I don't want the court to get the impression that if -- OK.  Thank you.

Deputy Colin just let me know that Miami-Dade Corrections and Rehabilitation has told him that they would put him in the juvenile section of Metro West.  They had told me TGK.  The point being is that it is a separate section of the state detention facility that would only house juveniles, no adults.  It is the same parameters, making sure, because I know the marshals have also toured that facility, that it meets the parameters of 5035 where this defendant will get all the things he's entitled to but still remain in a safe environment.

So I don't have any concerns about that.  But, again, if it would be, I'm the first one to say we can bring it back before the court and discuss it at that time to see how we can

solve those issues.  But I do think that we have gone above and beyond to make sure that this defendant's rights are protected under 5035.  That is because I, as a part of the Attorney General's Office, have to make sure to do that and that is what that statute requires of me.

What I'm asking this court to do is to make, sure given the efforts we have made and given the extreme danger I think he poses, and the court cannot be assured that he won't do this again or act out again, that the court find that he is a danger and hold him in detention.

THE COURT:  Last question on the analogy to a normal detention order.  The weight of the evidence is important.

Assuming I find, and I agree with you when I do that there's probable cause to charge that individual, in terms of the weight of the government's case, how do you think that cuts?

In other words, I'm envisioning a variety of defenses that could be raised, and so how does that cut?

In other words, there's a lot -- I mean, Mr. Kuhl may have been exaggerating for purposes of his case, but there are a lot of things that still need to be kind of filled in here, isn't that right?

MS. LOPEZ:  I still think that the weight of the evidence is strong.  Circumstantial evidence is sufficient evidence to convict.  There are plenty of cases in our circuit

and --

THE COURT:  Yes, but I don't detain a lot of people based on circumstantial evidence cases.

MS. LOPEZ:  I understand, Judge.

THE COURT:  I detain them because they found him with the gun and his DNA is on the gun and he admitted that he had the gun.  I mean, that is pretty solid.

MS. LOPEZ:  Yes.

THE COURT:  Because it is a clear and convincing standard for danger especially.

MS. LOPEZ:  Well, we have a defendant who is alone with the victim for three-and-a-half hours and during that period both her health information stopped saying that her heart is beating and she stops texting.  No one else is in that room.  No one else enters or exits that room except for him.  This is not a body found in the middle of the street somewhere where many cars and people have access.

We know, based on the video, it is only T and the victim in that room and, therefore, while we don't have an actual video showing him killing her, we know that he killed her by mechanical asphyxiation.  That can't be done without the actions of another doing so.  He had the three-and-a-half hours to do so when her phone and her health information show that she's pretty much not alive anymore, and we do have DNA on the scene because his semen is inside of her.

So I think that the weight of the evidence is strong. The weight of the evidence is strong, when we have no one else except T in the room with the victim, when her phone and her Apple watch stop showing that she is alive, and when we know --

THE COURT:  Was the defendant photographed and examined before he left the boat?

MS. LOPEZ:  I'm not aware if he was photographed because this didn't come out --

THE COURT:  Did he display any type of physical injuries?

MS. LOPEZ:  No.  I did ask this of the agent prior. He does not have or they did not see, let me put it that way, any evidence of injuries or anything on his body.  He was, and since the court is asking --

THE COURT:  Was he examined at the time?

MS. LOPEZ:  Well, he was Baker Acted because he began to cry uncontrollably and say that he was afraid he'd hurt himself and those around, and law enforcement were concerned about that so they took him to that facility.

I don't have access to those records because at this point mental health is not a defense or hasn't been made one. So because the court asked, I just let the court know he was not examined because they Baker Acted him and took him to the facility.  I don't know what the facility noted on him, but I know that the agents, when they interacted with him, did not

see any visible injuries on his body.

THE COURT:  OK.  OK.  I appreciate that.

All right.  So I need to conclude the hearing because I have to start my next hearing and I think we've covered the issues well enough.

MR. KUHL:  Your Honor, I think we just need to respond to a few brief points.

THE COURT:  No, that is OK.

The court finds that there is probable cause to charge the defendant as to the weight of the evidence involved there.

With all due respect to the prosecutor, I don't know that I'd characterize it as a strong case.  It is a case to be made, but also there are various defenses that may be also raised.  So it is a much closer call.

Secondly, in my review of the statute, there is clearly a presumption of a bond in a juvenile case.  Not a bond.  In fact, there are several cases that said that if the juvenile is released there is no bond.  There is not supposed to be a bond issued, on the theory that release is the presumption.

Third, upon my review of the statute I find, and government concedes, that he is not a risk of flight given the conditions that have been proffered to the court in terms of his appearance in court and, in fact, he has been made available to the government and made available to the court.

So the only issue, the only basis upon which I can detain are the second and third elements of 5034, which is that I find that he merits detention to ensure his safety or that of others.

In terms of his safety, I don't find that detention is necessary to preserve his safety based upon his current condition or at least the evidence of his condition as has been presented.

Additionally, detention in a Miami-Dade facility, far away from his family, may actually present a danger to him, and I think that that is a factor that I can take into account.

In fairness to the government, it is what it is.  I think the government has done a very good job of putting together an argument for why and how the defendant should be better housed here, but I actually think that if I had to call it right now I think he would be in greater danger in terms of his safety housed in a facility here far away from his family.

So therefore, the second and the first element of the statute have not been satisfied.

Then as to the danger of others, that is the most concerning factor.  To some extent the nature of the offense that the government is presenting is of such a unique and heinous character; however, it is a different type of an offense necessarily that I would expect the conduct to occur.  Unfortunately, according to the government's case, this

defendant became infatuated with his stepsister and something happened in that room and then she resulted in being raped and murdered.  But that is a highly personal offense that undermines my ability to make a finding that the defendant continues to present a danger to others.

The biggest danger is that the defendant presents to other family members.  So if the defendant is released, obviously I'd have to make sure that that situation was addressed.

In addition, the court takes into consideration Section 5035 where Congress has said detention shall be in a foster home or community-based facility located in or near his home community.  Defendant's proffer certainly address that better than the government's proposal because, in fact, he is being housed by a different member of the family who wants to take care of him and who is prepared to comply with the court's conditions.

So in consideration of the two statutes as a whole and considering the nature of the proceeding, I don't think a sufficient case has been made for me to impose detention at a Miami-Dade facility in this case, as heinous as the crime that we are talking about.

I will therefore release the defendant -- now I will also say that there's an additional consideration here which I think can be presented to Judge Bloom upon her decision if she

determines that this case is strong enough and warrants treating the defendant as an adult for purposes of the case.  I think at that point my release determination needs to be reconsidered, because obviously the factors that she would take into account in making that determination are relevant to the overall issue, and the government's case for now, for example, housing him in a facility here is stronger.

So I say that because I think the appropriate course at this point is for me to release him as he is a juvenile, but if that situation changes, I think Judge Bloom would be the right person to go to and say that she should vacate my ruling at that point and reconsider the housing determination.  It makes perfect sense to me for that to happen.

The other issue is that if I find that my interpretation of the statute is on its four corners is that if I order detention at this point, trial must be in 30 days.  I understand the government's argument, which is, well, despite the fact that the statute doesn't say if we file a motion to transfer him that tolls the running of the statute.  Contrary to the text of the statute, and I'm supposed to apply the text of the statute, and I don't see that anywhere here, and the logic of the statute would be undermined if that were the case, because then if the transfer to the adult proceedings would take six months, the defendant juvenile would be housed in detention for six months, according to the government, and that

just seems completely antithetical to a provision, an express provision of 5036.  So that is my reading of the statute.

Obviously that changes once the defendant's status is changed to an adult, and I think that really is the turning point in the case and merits reconsideration at that point. But for now, while the defendant is a juvenile, because I have a custodian acting, in effect, as a quasi foster home, because this is an individual who is not an immediate parent but he is a family member who is willing to house the defendant, I think release to his custody with conditions are appropriate.

Those conditions will include electronic monitoring with a GPS monitor, so that way the defendant understands that his location is being monitored at all times, and he is not ever going to be without monitoring, either digitally or in person, through his uncle.  I think that is an important consideration in militating against any risk of danger.

There is no risk of flight, but also, obviously, supports the alternative condition to address a risk of flight.

Additionally, the custodian will ensure that the defendant is not alone with anybody under the age of 18 at any point.  So if the custodian is home, that's fine.  If the custodian is not home, somebody as an adult needs to be at the home if the defendant is there, but the defendant cannot be present alone in either the home or any other location where the defendant is with any minors alone, unsupervised by an

adult.

I think that condition adequately addresses the government's strongest argument for detention.  So I will include that condition in the order of release.

The custodian obviously will be required to bring the defendant to any court proceeding as necessary to maintain the defendant with adequate food, condition, clothing, recreation, education, as well as psychological treatment and care, and I will require that Probation, that a psychological care plan be, to the extent it is not already being done, be presented that Probation will know about.

So with those conditions in place, I don't think detention is appropriate under the statute.

Anything else that the government wishes to add?

MS. LOPEZ:  Yes, your Honor.  First of all, I think Probation was about to get up to ask this.  Is the court considering this home incarceration or home detention for their purposes?

THE COURT:  It is home detention with allowances for the uncle, for the custodian's decision to remove the defendant in his custody, for example, to take him to church, to take him to medical facilities, to take him to a psychological consultation that may be required.  If the custodian is with him, taking him to work, to work with him, the custodian has the discretion to remove the defendant from essentially home

detention so that way Probation doesn't have to do it, but the home custodian understands that the defendant is in home detention subject to his removal of the defendant on supervised and necessary events.

How's that?

MS. LOPEZ:  Perfect.

Your Honor, the government would also request that he report as directed by Probation with an adult present since he is a minor.

THE COURT:  I will grant that request.

MS. LOPEZ:  That he provide proof of his schooling and school progress to Probation, just to make sure that he is being homeschooled appropriately and adequately.

THE COURT:  I'll grant that.

MS. LOPEZ:  That you restrict his travel between the Southern District and the Middle District.

THE COURT:  Granted.

MS. LOPEZ:  My understanding is that there are firearms in the home.  Normally we would request that they be removed.

THE COURT:  Yes.  Thank you.

Any firearms in the home, firearms and ammunition, should be turned over to a third-party custodian who will retain them pending the duration of the defendant's case, pending the duration that the defendant is housed with the

custodian.  If, obviously, if that changes, that is fine.

MS. LOPEZ:  Then the last thing the government would request, your Honor, as I mentioned, there is that existing matter in front of the state family court where, I guess, custody or the current custody agreement is being challenged.

What I would request is that the court order the third-party custodian and this defendant to follow the existing custody agreement currently in effect in state court until such a time as the state court amends it and provide a copy of the current custody agreement and any amendments to USPS so they are aware of it as well.

THE COURT:  I agree with your premise; however, I would like to modify the language because my understanding, and the parties have stipulated, is that the state court has approved, under the current 8020 arrangement, has approved for the father, so that the father's custodian, in effect, that is the uncle, to have custody of him at this point.

MS. LOPEZ:  It is the mother.  The mother.

THE COURT:  The mother.  I said the father.  I meant the mother's custodian.

MS. LOPEZ:  Yes.

THE COURT:  Right.

MS. LOPEZ:  If I misspoke, it should encompass that allowance.

THE COURT:  Since my order is consistent -- because,

obviously, the state court has primary responsibility on custody -- but my order is consistent with the current state court order, I'm placing for purposes of our case the uncle as custodian.  If the state court custody situation would undermine, would raise an inconsistency between my order and the state court order, then obviously the matter needs to be brought back.

MS. LOPEZ:  Right.  That is what I'm concerned about, is that we are he not violating any state court order.  I don't want them to get in trouble because of that.

THE COURT:  My order assumes that the current state court custody order is consistent.  If that changes, then I think both parties have an obligation to raise that with the court, because obviously -- say the state court found that the uncle was no longer a proper custodian.  Well, now I can't ignore that.  So yes.

So the way I would rephrase the condition is that the court's order is subject to the current state of the state court custody order and a material change in the state court custody order will require the matter to be reopened or revisited so that we're in compliance at all times with what the state court's primary responsibility is.

MS. LOPEZ:  And would the court ask that the parties, that either Mr. Ziske or T, provide the paperwork of the current custody agreement to Probation so they are aware of it,

or any amendments, because since it is a condition, I just want to make sure they are aware of what the parameters are.

THE COURT:  Right.  The defendant has the obligation --

MS. LOPEZ:  Thank you, your Honor.

THE COURT:  -- to present any change in state court orders to Probation and to the court.  OK.

MS. LOPEZ:  That is it, your Honor.  Thank you very much.

THE COURT:  Any additional things from Probation?

PROBATION OFFICER:  Yes, your Honor.  Just so that we're clear, when the minor is reporting to our office, he needs to be with a parent or guardian at all times so that he is not alone with an adult probation officer.

THE COURT:  In other words, you think he would go to probation alone?  Is that what you are saying?

PROBATION OFFICER:  Well, if the probation officer comes to the home --

THE COURT:  Right.

PROBATION OFFICER:  -- an adult needs to be there.

THE COURT:  I see what you are saying.  Yes.  Granted.

PROBATION OFFICER:  And then -- I have notes everywhere -- for the third-party custodian, normally we do our own background check.  We wanted to make sure you still want us to do that because that is usually how we do it as part of the

bond paperwork.

THE COURT:  Sure.  Yes.

PROBATION OFFICER:  I will get that information from his uncle.

THE COURT:  That's fine.

PROBATION OFFICER:  Thank you.

THE COURT:  OK.  So I'm going to release you, defendant, on your uncle's custodian and representation that he is going to take care of you and that you are going to be in his custody.  So the court's directing you to make sure, given the seriousness of the case that you're already involved in, that you not make that case any more serious by not fully following his instructions.

Do you understand?

THE DEFENDANT:  Yes, sir.

THE COURT:  Very good.  All right.  Thank you.

MS. LOPEZ:  Thank you, your Honor.

(Adjourned)

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


April 19, 2026            s/ Joanne Mancari
                          Joanne Mancari, RPR, CRR, CSR
                          Court Reporter
                          jemancari@gmail.com